Victor Anderson, Appellee, v. City of Chicago, Appellant.

Gen. No. 41,731.

Opinion filed March 18, 1942.

BARNET HODES, Corporation Counsel, for appellant; JAMES A. VELDE, RUSSELL BUNDESEN and L. LOUIS KARTON, Assistant Corporation Counsel, of counsel.

PEDEN, MELANIPHY, RYAN & ANDREAS, of Chicago, for appellee; JOHN C. MELANIPHY and GERALD RYAN, both of Chicago, of counsel.

MR. JUSTICE KILEY delivered the opinion of the court.

This is an action under An Act to Suppress Mob Violence (ch. 38, secs. 512–517, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann., 37.481–37.486]), in force at the time of the incident subject of the complaint. The jury returned a verdict in plaintiff's favor for $7,500. The trial court denied defendant's motion for a judgment notwithstanding the verdict and entered judgment for plaintiff. The defendant City of Chicago has appealed.

On May 26, 1937, a strike was called at the Republic Steel plant at 118th street and Burley avenue in the City of Chicago. In the afternoon of May 30th, several thousand people gathered near "Sam's place," a tavern at 113th street and Greenbay avenue north and east of the plant. There were speeches, a distribution of placards bearing slogans in support of the strike and a distribution of some clubs, rocks, iron slugs and gas pipe among persons in the gathering. This activity was observed by a member of the Chicago police who reported the same to his superior.

At about 3: 30 or 4: 00 o'clock, several hundred people commenced to march south on Greenbay avenue toward the plant. At this time plaintiff, who denies going to the scene to participate in the demonstration, drove up to Greenbay avenue and 112th street and parked his car in that vicinity. He lived at 9919 Ewing avenue, Chicago, and testified that he and his companion Hilding Engdal were going to a cemetery in Hammond, Indiana "to visit the grave of some friend of my sister-in-law"; that he had never been to 113th street and Greenbay avenue before and did not know "Sam's place" was there; that he intended to drive to Hammond by Avenue "O," one block east of Greenbay avenue, and had driven west over 112th street from Ewing avenue, after driving south on Ewing from his home; that reaching avenue "O" he saw the gathering and went over to see if it was a picnic; that he went to the cemetery several times but not always to see the grave of the friend of his sister-in-law, but sometimes only for the ride; that when going there he did not always go by way of 112th street and avenue "O"; that he did not know there was to be a meeting of strikers around "Sam's place" and did not know the Republic Steel Company's plant was at 117th street and Burley avenue.

After parking his car, plaintiff conversed with Engdal for some minutes and then started walking after the marching crowd, but never approached closer than 200 feet of it. The march continued south on Greenbay avenue to 114th street, then across the prairie toward 117th street and Burley avenue with many of the marchers carrying the placards, clubs, rocks, iron slugs and pieces of hollow pipe distributed near "Sam's place." Between 115th street and 116th street, about 200 policemen under the supervision of Captain Mooney of the Chicago Police Department stood in skirmish formation. The police had been on strike duty since May 26th and there had been clashes

near the plant. As the marchers advanced they were commanded by the police to disperse. The command was followed by threats of the marchers, a barrage of missiles thrown at the police, tear gas bombs thrown by the police, and the firing of shots. Plaintiff says he heard a whistle blow and then the sound of shots; that he and his friend turned and started running north; that after a few steps he received a bullet in the back of his left knee; that he was paralyzed and fell into a ditch where he lay for 20 minutes or a half hour; that other bullets struck against the ditch above him; that people ran over the ditch pursued by policemen clubbing them down, shooting and throwing bombs; that he lay there bleeding until two policemen came upon him and one cursed him, jumped on his left leg, kicked him several times in the crotch, dragged him out by the hair, stood him up, cursed him again, commanded him to walk, clubbed him, kicked him in the ribs and was finally restrained by the other policeman from inflicting further punishment on plaintiff.

There is no question but that the plaintiff was seriously, painfully and brutally injured. Medical testimony showed the bullet entered the rear of plaintiff's left knee joint and caused a comminuted fracture of the left femur at its juncture with the knee joint and, as a result of his injuries following the shooting, his left testicle wasted away. He was treated in various hospitals for several months and, at the time of the trial, walked with the aid of a cane with a limitation of over 25 per cent in the action of his left knee. At the trial he had an enlarged knee joint, the lower one-third of his left thigh was diminished in size and the testimony was that the injuries were permanent.

The complaint here is founded upon section 4 of the Act—(ch. 38, secs. 512–517, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 37.481–37.486]) which provides:

"§ 4. Any person or persons composing a mob under the provisions of this act, who shall by violence inflict material damage to the property or serious injury to the person of any other person upon the pretense of exercising correctional powers over such person or persons, by violence and without authority of law, shall be deemed guilty of a felony, and shall suffer imprisonment in the penitentiary not exceeding five years; and any person so suffering material damage to property or injury to person by a mob shall have an action against the county, park district or city in which such injury is inflicted for such damages as he may sustain, to an amount not exceeding ten thousand ($10,000) dollars." Plaintiff charges in the complaint that the marching strike sympathizers constituted a mob within the meaning of the act; that he was injured as a result of the mob's violence and that the City is liable for such injuries. The City answered that it was not liable under the Act and that the plaintiff was injured by City police engaged in suppressing an unlawful assembly. The defendant contends that the plaintiff did not prove that the marchers were assembled for either of the purposes set forth in Section 1 of the Act, so as to constitute a mob thereunder. Plaintiff refers us to many cases which define the word "mob." We have not considered the cases because the Act itself defines the word for its purposes. Section 1 reads as follows: "§ 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* That any collection of individuals, five or more in number, assembled for the unlawful purpose of offering violence to the person or property of any one supposed to have been guilty of a violation of the law, or for the purpose of exercising correctional powers or regulative powers over any person by violence, and without lawful authority, shall be regarded and designated as a 'mob.' " Plaintiff claims that the evidence shows that the marchers had the

purpose of exercising correctional or regulative powers over the strikebreakers in the plant. This claim, he says, is supported by the testimony of shouts of marchers that they were going "to get them men out who were working there" and "get them finks out of the mill."

The question is whether such a purpose brings the marchers within the definition of Section 1. Because of plaintiff's claim, a knowledge of the meaning of the words "correctional" and "regulative" as used in Section 1 is essential for determining whether the marchers in this case were a mob.

No Illinois case has been cited which defines the words, "correctional" and "regulative" as used in the Act. The case of *Reynolds v. Lathrop,* 133 Ohio St. 435, decided in 1938, involved consideration of a statute which defined a mob as:

"A collection of people assembled for an unlawful purpose and intending to do damage or injury to any one, or pretending to exercise correctional power over other persons by violence and without authority of law." In that case plaintiff was injured by the violence of ten or twelve strikers who mistook him for a "scab." The Supreme Court of Ohio held that the trial court properly dismissed plaintiff's action, and said:

"If the mob, in assaulting and injuring him, is attempting to administer justice with its own hands in the interest of the public good and is not acting for its own selfish or personal ends, then the assailants exercise correctional power by force and without authority of law." And further: "A group composed of persons sympathetic to the element supporting the strike attacked a supposed scab or strikebreaker in the interest of the strikers. This conduct did not constitute the exercise of correctional power within the meaning of the statutes." In an Indiana case, *Shake v. Board of Com'rs of Sullivan County,* 210 Ind. 61,

1 N. E. (2d) 132, an action was brought by injured strikebreakers under the Indiana Mob Violence Act and the Supreme Court of Indiana held that the words "correctional" and "regulative," "refer to violence offered for the purpose of exercising correctional and regulative powers vested by law in the government, for we cannot conceive of the Legislature taking cognizance of other rule or law-making authority." Plaintiff points out that in that case the late Justice TREANOR in a dissenting opinion held that the terms "correctional" or "regulative" powers also included acts of violence to compel conformity to the ideas and standards of the persons using the violence, even though the ideas and standards of the persons using the violence, might be contrary to the law of the State. Justice TREANOR, however, concluded his dissenting opinion with the following words: "The evil aimed at in these statutes is the substitution of the exercise of irresponsible power of private individuals for the orderly exercise of power by the state."

In other words, plaintiff contends that since the evidence would indicate that the assemblage had the purpose of taking the strikebreakers out of the plant, that it was thereby purposing to make the strikebreakers conform to the conduct of the strike sympathizers; to exercise correctional powers over the strikebreakers. Determination of this interesting point requires consideration of the context of the entire act. The purpose of the act is to impose upon municipalities, to which the State has delegated police power, the responsibility of protecting its residents against the unlawful exercise, by unauthorized groups of persons, of powers delegated. Section 1 declares that any such group collected for the purpose of offering violence to a person supposed to have committed a crime or exercising correctional or regulative power over others by violence, is a mob. Section 3 declares that any person or persons composing a mob with

intention to injure a person charged with a crime, or pretending to exercise correctional powers over such person by violence and without authority of law shall be guilty of a misdemeanor. The word "such" in Section 3 refers to "a person charged with a crime." Section 4 provides a penalty for persons forming a mob who materially damage the property or seriously injure (as defined in section 2) any other person under pretense of exercising correctional powers over such person, and also provides a remedy for any person whose property is so damaged or person so injured. Section 5 provides a cause of action for dependent survivors of any "such other person" suffering death by lynching at the hands of a mob. Thus it appears that while Section 1 would indicate the Act had as its purpose imposing upon municipalities the responsibility of protecting persons whether charged with, or supposed to have committed, crime or not, Section 3 clearly limits the responsibility to persons charged with crime, and while Section 4 apparently gives no relief for injuries, from a mob, to a person charged with or supposed to have committed a crime, Section 5 provides a remedy for the dependent survivors of any such person if the mob killed him. Agreement with plaintiff's contention that the marchers here constituted a mob under the Act would require disregarding the words, "without lawful authority" which in each section of the Act excludes from the definition "mob" *authorized groups* assembled to exercise correctional powers. "Without lawful authority" implies the possibility that some group could have lawful authority to do the act purposed, and it is inconceivable that in this State any persons should be lawfully authorized to exercise correctional powers over other persons, with violence, to make the latter conform to standards of conduct other than those established by law; or that the strike sympathizers here could be lawfully empowered to use

violence to coerce non-strikers to conform. It seems clear, therefore, that the intention of the legislature, as expressed in the Act, was to impose upon municipalities in Illinois the responsibility of preventing mobs from interfering with the orderly processes of established law and of preventing mobs from arrogating to themselves the powers given by this State to its municipalities, to force people into compliance with that law. We are of the opinion, therefore, that the crowd that gathered at "Sam's place" and marched toward the plant and against the police, was not a mob within the meaning of the Act.

The evidence before us does not tend to prove that plaintiff was the intended victim of a mob nor that his injuries were inflicted by it. We think the language of Section 4 of the Act, set out hereinabove, clearly requires such proof. Pertaining to that point, Section 4 reads: ". . . upon the pretense of exercising correctional powers over such person. . ." The words, "such person" refer to "injury to the person of any person" preceding the former in the same sentence and describing the person injured by a mob. It follows that plaintiff must have been the object of the mob's purposed correctional powers to meet this requirement of the Act. For these reasons, therefore, plaintiff's theory that the crowd's purpose was to correct the strikebreakers, invoked to aid his cause under Section 1 is harmful to his cause under Section 4. Plaintiff further contends that a correct construction of Section 4 does not limit the action therein provided to any person injured by a mob and that the phrase, "any person so suffering . . . injury" is referred by the word "so" to Section 2 of the Act, wherein serious injury is defined. We cannot agree with this contention. Under "the last antecedent clause" doctrine, *Stevens v. Illinois Cent. R. Co.,* 306 Ill. 370, "so" must relate to its nearest antecedent

unless the context of the entire Act requires a more remote relationship and the Act under discussion does not so require. We believe that under the true construction of section 4, the word ''so'' relates to ''any other person'' in the same sentence. Our view is, therefore, that the plaintiff must have been injured by a mob to bring his suit within the Act. There is no dispute as to the source of the injuries to plaintiff except as to the shooting. Plaintiff's brief does not indicate his position as to who shot him, but he does contend that Lieutenant Ryan's testimony indicated that others beside the police had fired shots. A reading of Ryan's entire testimony and considering the improbability of the marchers shooting in the direction they were running from the police, will readily give support to our finding that no inference is justified from the record that there was shooting by any one other than the police. As we have said, however, even if the marchers shot plaintiff, another inconsistency in his case arises because plaintiff claims the marchers were purposing to correct the strikebreakers and not him. It was necessary to show that a mob pretending to exercise correctional powers by violence over plaintiff, injured him. Plaintiff was not the object of the strike sympathizers' purpose, the strikebreakers were; plaintiff was not a strikebreaker, he was a bystander; and he was not injured by the strike sympathizers.

It is our opinion that the plaintiff was required to prove that the marchers constituted a mob as defined by the Act; that the mob assumed the powers lawfully authorized in other persons and sought to exercise such powers over the plaintiff, and in pursuance of such unlawful purpose injured the plaintiff.

The evidence before us, considered in the light most favorable to plaintiff, together with the reasonable inferences drawn therefrom in his favor, does not

tend to establish these essentials. The trial court should have granted defendant's motion for a judgment notwithstanding the verdict.

For the reasons herein given the judgment of the superior court is reversed and judgment is entered here for costs for the defendant and against plaintiff.

*Judgment reversed and judgment here for defendant and against plaintiff.*

BURKE, P. J., and HEBEL, J., concur.