**Wilbert K. Slaton, Appellant, v. City of Chicago, Appellee.**

**Gen. No. 46,377.**

First District, Second Division.
November 22, 1955.
. Rehearing denied December 13, 1955.
Released for publication December 14, 1955.

Fleetwood M. McCoy, and Moore, Ming & Leighton, all of Chicago, for appellant; Fleetwood M. McCoy, William R. Ming, Jr., George N. Leighton, and Walter K. Black, all of Chicago, of counsel.

John J. Mortimer, Corporation Counsel of City of Chicago, for appellee; L. Louis Karton, Head of Appeals and Review Division, and Sydney R. Drebin,

■■■■■■■■■■■■■■■■

Assistant Corporation Counsel, both of Chicago, of counsel.

JUDGE ROBSON delivered the opinion of the court.

This is an action by Wilbert Slaton against the City of Chicago to recover damages for personal injuries under the provisions of "An Act to Suppress Mob Violence," ch. 38, secs. 512–517, Ill. Rev. Stat., 1953 [Jones Ill. Stats. Ann. 37.481–37.486]. At the close of plaintiff's evidence, the trial court sustained a motion to direct the jury to bring in a verdict of not guilty. Plaintiff filed a motion for new trial which was overruled and the court entered judgment upon the directed verdict. Plaintiff appeals.

The single issue is whether there is evidence showing that plaintiff falls into the class of persons who sustain "material damage to property or injury to person by a mob. . . ." Ibid., sec. 515.

■ The trial court directed a verdict against plaintiff, and we must take all the evidence in favor of plaintiff and all inferences which can reasonably be drawn therefrom as true and from that determine whether there was any substantial evidence on which to submit the case to the jury.

The record reveals that on the 14th day of August, 1947, there was located on the east side of Halsted street between 103rd and 105th streets a public housing development known as the Fernwood Park Housing Development. The project consisted of 67 apartments, eight of which were occupied by Negro families and the rest by white families. The Negro families moved into the project on August 12, 1947, two days before the incident in question. The next day more than a thousand people assembled on the streets surrounding the project and threatened to evict the Negro families. On the day in question be-

tween the hours of 9:00 and 11:00 o'clock p. m. several thousand persons had assembled about the project. The crowd was dense and traffic on Halsted street was impeded and blocked for over two hours from 100th to 105th streets, including the intersection of 103rd and Halsted streets. Its members stopped cars and opened their doors to find out if there were any Negroes in them. In one instance a taxicab was stopped and examined. Some of the crowd said, "There aren't any niggers in there, let 'em go. We are going to run the niggers out of the project, get 'em out of here." A large number of policemen were assigned to the scene. The unlawful assembly of people was armed with bats, sticks, bricks and stones. On some occasions stones and bricks were thrown.

Between 11:00 and 12:00 o'clock midnight plaintiff was driving north on Halsted street. He was detoured by police officers at 107th street to Peoria street where his automobile was again detoured by other police north to 103rd street. There the detour by the police ended. Plaintiff proceeded east on 103rd street to drive back to Halsted street. A large crowd had gathered at the intersection of 103rd and Halsted streets. They started yelling, "Niggers"; "Here comes a bunch of niggers"; "Get that nigger driver in that car; what is that black son-of-a-bitch doing driving through here? Get that nigger driver of that car." Plaintiff started to turn northward into Halsted street when members of the crowd started throwing bricks at the car and its occupants. One of them struck the plaintiff on the right side of the skull and another struck a woman occupant of the automobile. Other missiles struck various parts of the automobile. Plaintiff was rendered unconscious momentarily and was bleeding profusely. He revived sufficiently to operate his automobile northward along Halsted street. When he reached 60th street and Washington Park he stopped the car and turned its wheel over to one of his com-

50

panions who drove it to Provident Hospital and later to the County Hospital where plaintiff was given treatment and his head wound stitched.

The pertinent provisions of the Act, Ill. Rev. Stat. 1953, ch. 38, secs. 512 and 515, read as follows:

"Sec. 512. Mob defined. . . . Be it enacted by the People of the State of Illinois, represented in the General Assembly: That any collection of individuals, five or more in number, assembled for the unlawful purpose of offering violence to the person or property of anyone supposed to have been guilty of a violation of the law, or for the purpose of exercising correctional powers or regulative powers over any person by violence, and without lawful authority, shall be regarded and designated as a 'mob.' "

"Sec. 515. Damage by violence—Penalty—Action against municipality. . . . Any person or persons composing a mob under the provisions of this act, who shall by violence inflict material damage to the property or serious injury to the person of any other person upon the pretense of exercising correctional powers over such person or persons, by violence and without authority of law, shall be deemed guilty of a felony, and shall suffer imprisonment in the penitentiary not exceeding five years; and any person so suffering material damage to property or injury to person by a mob shall have an action against the county, park district or city in which such injury is inflicted, for such damages as he may sustain, to an amount not exceeding ten thousand ($10,000) dollars."

In the interpretation of this law, it is important to review its general historical background.

Municipal liability for damage to property by riot appeared in England first in 1714 (1 Geo. I, Stat. 2 c. v. [13 Stats. Large 142]; see also 7 & 8 Geo. IV, c. xxxi [67 Stats. Large 202] [1827]) and is found in modified form in "The Riot (Damages) Act," 49 & 50 Vict., c. xxxviii (1886 Gen. Stats. 89). Municipal liability for

particular crimes or injuries to the person, while it had a rudimentary existence early in the laws of England, experienced a progressive attenuation in development and eventually died. See Pomeroy's Municipal Law (2d ed. 1883) 235–6; I Reeves' Hist. Eng. Law (New American ed. 1880) 195, n. (a) and 196; III Wendell's Blackstone (1857) 160–1; Pollack and Maitland, Hist. Eng. Law, vol. i, p. 88, vol. ii, p. 578; I Holdsworth's Hist. Eng. Law (3d ed. 1922) 15, 294. See further Statute of Winchester or Winton, 13 Edw. I, Stat. 2 (1 Stats. Large 230) (1285); 28 Edw. III, c. xi (2 Stats. Large 101) (1354); 27 Eliz., c. xiii (6 Stats. Large 373) (1585); 29 Car. III, c. vii (3 Stats. Large 412) (1676); 8 Geo. II, c. xvi (16 Stats. Large 511) (1735); 22 Geo. II, c. xxiv (19 Stats. Large 305) (1749); and cf. 9 Geo. I, c. xxii (15 Stats. Large 88) (1722). All of these Acts were repealed and municipal liability for particular crimes or injuries to the person was omitted from the consolidating Act, 7 & 8 Geo. IV, cc. xxvii–xxxi (67 Stats. Large 168) (1827). See also 6 Encyc. Law of Eng. (2d ed. 1907) 638–9. Examination and analysis of these early statutes show quite clearly, however, that of their several purposes one, at least, and perhaps the one most important, was to impart to and instill in each local community or political subdivision of the state and its members a strong sense of their integration with and responsibility to the state for the execution of its governmental policies, as expressed in its laws. The ultimate result desired was to instill respect in the people for law and order and an abiding belief in their dominion and supremacy. Amercement of the community or its inhabitants was exacted for breach or violation of the statutes. These statutes bespeak unequivocally the intolerant will of the state against the outlaw community and its members.

Mob and riot laws in the United States imposing liability upon municipalities for damage to property

only, appeared as early as 1836 in the City of Philadelphia, and in 1841 in the county of Philadelphia. County of Allegheny v. Gibson, 90 Pa. St. 397; Purdon's Pa. Stat. Ann., tit. 16, c. 28, secs. 3921–3925. Massachusetts had such a law in 1839 (Mass. Ann. Laws, c. 269, secs. 1–9) and New York in 1855 (Section 71, Gen. Mun. Law, New York, formerly Gen. Mun. Law, 1892, c. 685, sec. 21, and L. 1855, c. 428). Approximately half the states have adopted similar laws, some imposing municipal liability for damage to property only, some for injuries to the person only, and others extending liability to cover both cases. See, generally, Liability of the Municipality for Mob Violence, 6 Fordham L. Rev. (1937) 270; 13 A. L. R. 751; 23 A. L. R. 297; 44 A. L. R. 1137; 52 A. L. R. 562. Examination of the statutes under these classifications reveals that they have spawned numerous species.

The Illinois legislation imposing municipal liability for damage to property and injury to the person evolved during the post-Civil War period. The conflict between labor and industry in part characterized this period of expansive economic industrialization. Police killed and injured six strikers on May 3, 1886, at the Chicago-McCormick Harvester Works. The following day a bomb was thrown and seven policemen were killed and about 60 persons injured when the police attempted to disperse a meeting of strikers and strike sympathizers.

In 1887 in his biennial message to the General Assembly, Governor Richard J. Oglesby referred to the strike of the quarrymen in Will and Cook counties in April, 1885, and the switchmen in East St. Louis, St. Clair county, in March-April, 1886. Examples of damage to property by mob violence and riots were cited. Railroads called men from everywhere at high wages to protect their properties. In some cases they had them deputized by county sheriffs to assist in breaking strikes. In one instance this resulted in the killing and

wounding of six or eight persons. The governor criticized the many requests of the sheriffs of the counties for State militia and the failure on the part of some of them to exhaust all means at their disposal in meeting the problem. The governor requested laws to meet these and related problems. The General Assembly at that session enacted "An Act to indemnify the owners of property for damages occasioned by mobs and riots," Ill. Rev. Stat. 1953, ch. 38, secs. 518–524 [Jones Ill. Stats. Ann. 37.487–37.493], and "An Act to secure the peace and good order of society, to quell riots or disturbances, to secure the execution of the laws, and to provide for special deputy sheriffs, and for calling out and using the military force of the state for the preservation of the peace and the protection of property," Ill. Rev. Stat. 1953, ch. 38, secs. 525–535 [Jones Ill. Stats. Ann. 37.470–37.480]. Section 534 provides for a fine of not less than $100 nor more than $200 where "any force or company of private detectives or private citizens, not peace officers, . . . parade with arms, except when specially permitted to do so by the governor, or . . . assume to act as officers of the law, without proper authority. . . ."

In 1895, Governor Altgeld in his message to the General Assembly reviewed at length the history of the Pullman strike of 1894, and recounted incidents of property damage, violence and riot.

During this same general period, lynching, another manifestation of untrammeled mob rule, reared its sordid head. It won for itself a gruesome record in the decade before 1900. In its most evil year, 1892, 155 Negroes and 100 white people were lynched throughout the country. See, generally, Raper, The Tragedy of Lynching (Univ. of N. C. Press 1933); Chadbourne, Lynching and the Law (Univ. of N. C. Press 1933).

In 1897 House Bill No. 395 entitled "An Act for the suppression of mob violence and lynching" was intro-

54

duced. This bill failed during the readings. In 1899 House Bill No. 462, "An Act for the suppression of mob violence," was introduced and was amended to read, "An Act for the suppression of mob violence, riot or lynching and to indemnify persons injured thereby," etc. This bill was voted down in its final form, objectionable, perhaps, because it was very broad in scope. For similar laws see the statutes in Kansas, Kan. Gen. Stat. 1949, secs. 12–201 to 12–202, and Wisconsin, Wis. Stat. 1950, sec. 66.091, and the annotated cases interpreting those laws. After subsequent attempts and failures in Illinois in 1901 and 1903 to pass identical or similar bills, the General Assembly in 1905 finally enacted the present law.

It is with this historical and legislative background that we consider the issue in this case. Involved is a social problem inherent in our system of society and far-reaching in importance. Our people are of varied religious, ethnic, economic and cultural backgrounds. We have assumed world leadership in the establishment of a system of government wherein the incidents of birth and life have not been permitted to determine the rights of citizens before the law. No group or segment of a community has the right to dictate by force or by other unlawful means who shall or shall not live within the community. The unlawful assembly of people gathered together in the instant case apparently believed that the duly constituted authorities in admitting colored tenants into the housing project were harming the community. Allowing these tenants to remain in the project, they believed, would be detrimental to the value of the community property and ultimately affect the way of life of the community. They therefore undertook to prevent the entrance of Negroes into their community. In so doing they were not acting to promote their individual interests but what they wrongfully assumed to be a

55

collective or community interest. They thus supplanted the legally constituted officers of the community, and it was in the pursuit of this unlawful arrogation of authority that the plaintiff was injured. This we consider to be the distinguishing feature of this case.

Does the statute in question afford the plaintiff any right of redress against the defendant for failure of the community and the local authorities to effectively combat the unlawful assembly of people thus engaged?

No case cited by defendant from this and the few jurisdictions which have an identical or substantially similar law is in point in the instant case. Defendant cites Barnes v. City of Chicago, 237 Ill. App. 464, affirmed 323 Ill. 203; Anderson v. City of Chicago, 313 Ill. App. 616; Kennedy v. City of Chicago, 340 Ill. App. 100; Brannock v. City of Chicago, 348 Ill. App. 484; Shake v. Board of Com'rs of Sullivan County, 210 Ind. 61, 1 N.E.2d 132; Hailey v. City of Newark, 22 N. J. Misc. 139, 36 A.2d 210; Lexa v. Zmunt, 123 Ohio St. 510, 176 N. E. 82; Reynolds v. Lathrop, 133 Ohio St. 435, 14 N.E.2d 599; Hammett v. Cook, 42 Ohio App. 167, 182 N. E. 36. The State of Nebraska has an almost identical statute, Neb. Rev. Stat. 1943, ch. 23, secs. 1001–1009, but no cases appear to have been decided interpreting it. West Virginia, which has a similar statute, has recently given it a broad interpretation. See Meadows v. City of Logan, 121 W. Va. 51, 1 S.E.2d 394. Similar in the purport given to the language in the statute by the court in the Meadows case, supra, is the Ohio case of Lexa v. Zmunt, supra, and the Ohio cases therein cited: the purpose of the statute is "the prevention and suppression of the operation of self-constituted groups, by whatever name, which form and assemble for the purpose of inflicting punishment upon those whom they conceive to have been guilty of conduct offensive to them, and which should in some

56

manner receive punishment, or for the purpose of intimidating and compelling action and conduct in accordance with the views and desires of the intimidators." Ibid., at pp. 513–4, Ohio, and p. 84, N. E.

In the Illinois case of Anderson v. City of Chicago, supra, at p. 622, the court said, "The purpose of the act is to impose upon municipalities, to which the State has delegated police power, the responsibility of protecting its residents against the unlawful exercise, by unauthorized groups of persons, of powers delegated." Again, elaborating, at p. 624: ". . . the intention of the legislature, as expressed in the Act, was to impose upon municipalities in Illinois, the responsibility of preventing mobs from interfering with the orderly processes of established law and of preventing mobs from arrogating to themselves the powers given by this State to its municipalities, to force people into compliance with that law."

■ We find it unnecessary to decide whether the intendment of the statute is satisfied where there is merely shown a purpose on the part of some group of five or more individuals to inflict summary punishment upon the person of another for some infraction, although for the infraction of no established law, as is indicated in some of the cases in other jurisdictions. We proceed upon the premise of intent as reasoned by us from the Anderson case, supra, at p. 624, that one of the purposes of the statute was to discourage and prevent interference with the orderly processes of administering the law or powers delegated to the local authorities, and the usurpation of those powers, wholly or in part, by unauthorized groups of persons for what they wrongfully assume to be a collective or community interest.

The negligence or inefficiency of local authorities is not the sole basis of the municipality's liability under the statute. Kennedy v. City of Chicago, supra, at p.

105. One of the objects of the statute is to impose sanctions against the citizens of the community when they participate in or allow the condition to arise that we find in the instant case. An analysis of the language used in People v. Nellis, 249 Ill. 12, 20, clearly shows that the statute in question imposes a corollary responsibility upon the members of the community to "cause the taxpayers of such county or city to discourage the assembling of mobs within such municipalities and . . . cause all law abiding men residing in such communities to condemn and denounce mob violence, the result of which must be to create respect for the law and its enforcement and to discourage the assembling of mobs." Some criticism has been raised as to whether the statute actually effectuates these and other objects. Various alternative legislative rationales have been suggested, some of them perhaps too broad. Cf., e. g., Note, Communal Liability for Mob Violence, 49 Harv. L. Rev. (1936) 1362.

The Anderson case, supra, at p. 624, makes the following statutory interpretation and lays it down as a prerequisite to recovery:

"It seems clear, therefore, that the intention of the legislature, as expressed in the Act, was to impose upon municipalities in Illinois the responsibility of preventing mobs from interfering with the orderly processes of established law and of preventing mobs from arrogating to themselves the powers given by this State to its municipalities, to force people into compliance with that law."

We believe, however, when we consider the historical and legislative background, that this interpretation is too narrow and restrictive and that for this court to adopt it would render the statute impotent. We believe a more logical interpretation of the statute would

58

allow recovery under the Act in those cases where it is shown that the unlawful crowd of people was assembled for the purpose of carrying out what it believed was its collective or community interest, and in the execution of that purpose took over the powers lawfully delegated to and vested in the local authorities in order to exercise such powers correctionally and summarily over the plaintiff.

Plaintiff's evidence in the instant case shows sufficiently the effective seizure and usurpation by the unlawful assemblage of the powers of control and enforcement putatively vested in the local authorities. This condition had existed for two days. The community and the authorities had full knowledge of it. The local authorities at times and at certain points were powerless. At those times and at those points, there was no lawful authority, only the lawlessness of mob rule. Milling masses, at times numbering thousands, and lesser crowds of hundreds or fewer associated with the principal body, blocked or halted pedestrian and motor traffic and without interference boldly opened the doors of cars suspected of carrying Negro occupants. What would have occurred had they found any is poignantly illustrated by what happened to plaintiff. The mob desired and it effected control in the area by force and violence for the purpose of ousting the Negroes from the public housing project, off the streets and out of the area for what they wrongfully assumed to be a collective or community interest. The mob challenged the sovereign police power of the State and its delegation to the local authorities. We are of the opinion that it was the legislative intent in enacting the law to impose a penalty upon the community in the form of additional taxes when its members participate in or allow the condition to arise that we find in the instant case. By its very nature the

59

enforcement of law must be exclusively delegated to properly constituted and responsible authorities. This the people of the State have done. It is the responsibility of the community to co-operate and assist the authorities in the orderly execution of their duties. A mob must not be permitted to usurp these powers of regulation and correction. This kind of outlawry, we believe, was one of the evils the statute was designed to prevent.

The cases of Barnes v. City of Chicago, Anderson v. City of Chicago, and Brannock v. City of Chicago, supra, are not controlling in the instant case. In none of these were the facts similar. In the Brannock case there was no evidence showing the purpose of the crowd which injured plaintiff. In the Anderson case there was no showing that the strikers and strike sympathizers intended to seize and usurp the powers delegated to the local authorities. They dispersed before the local authorities. In the Barnes case the action was brought under Section 516 of the statute, the anti-lynching provision, by the dependent heir of the policeman who had been shot and killed by the crowd, and the case was decided according to the definition of lynching which required that the person killed must have been at least suspected of some crime.

█ We conclude, therefore, that the record reveals that the plaintiff made out a prima facie case under the statute, and it was error for the court to direct a finding for the defendant at the close of plaintiff's case. The judgment of the trial court is reversed and the cause remanded for a new trial.

Judgment reversed and cause remanded with directions.

McCORMICK, P. J. and SCHWARTZ, J., concur.