Lawrence LANDRY et al., Plaintiffs,

v.

Richard J. DALEY, Mayor of the City of Chicago, Cook County, Illinois et al., Defendants.

No. 67 C 1863.

United States District Court
N. D. Illinois, E. D.

March 1, 1968.

---

27. See cases note 26 supra.

See also D.C., 280 F.Supp. 929; 280 F.Supp. 968.

Robert L. Tucker, R. Eugene Pincham, Kermit Coleman, Jean F. Williams, Ellis E. Reid, Lawrence E. Kennon, Leonard Karlin, Norman E. Lapping, Irving Birnbaum, Leo E. Halt, Cecil C. Butler, Edward Thomson, Chicago, Ill., Dennis J. Roberts, Newark, N. J., William M. Kunstler and Arthur Kinoy, New York City, for plaintiffs.

John J. Stamas, State's Atty. of Cook County, Edward J. Hladis, Chief of Civil Division, Ronald Butler, Asst. State's Atty., for State officials.

Raymond F. Simon, Corp. Council of Chicago, Richard J. Elrod, Asst. Corp. Counsel, Kenneth W. Sain, Asst. Corp. Counsel, for city officials.

Robert Plotkin, Philip W. Moore, Michael L. Shakman, Neil Komesar, Robert Howard, Chicago, Ill., amici curiae.

Before HASTINGS, Circuit Judge, and HOFFMAN and WILL, District Judges.

## OPINION

WILL, District Judge.

This is allegedly a class action, brought by the plaintiffs pursuant to Rule 23(a) (1) (3) of the Federal Rules of Civil Procedure on their own behalf and on behalf of all others similarly situated, seeking declaratory and injunctive relief. Some of the individual plaintiffs are negro citizens who currently face criminal prosecution before the Circuit Court of Cook County, Illinois. These prosecutions arose out of a series of demonstrations taking place in Chicago, Illinois, in 1967. Plaintiff, ACT, is an unincorporated association, maintaining offices in Chicago, Illinois, among the purposes of which is to secure negro citizens their federal rights and end all forms of racial segregation and discrimination. To obtain these objectives, it engages in a variety of protest activities, including picketing, demonstrations, rallies, mass meetings, voter registration drives, community organization and publication. Plaintiffs, Lawrence Landry, Robert Lucas, Robert Brown and Michael Rogers are negroes and sue as representatives of the class of all negroes in the City of Chicago. Defendants are either officers of the City of Chicago, Illinois, or officers of Cook County, Illinois.

This Court has jurisdiction of this cause on the basis of both general federal question jurisdiction, 28 U.S.C. § 1331, and specific federal jurisdiction over cases seeking relief for certain specified federal wrongs, 28 U.S.C. § 1343.[1]

The complaint alleges that the defendants have purposefully entered into a plan or scheme of concerted and joint action among themselves and with other persons unknown to the plaintiffs to deprive the plaintiffs of rights, privileges and immunities secured to them by the Constitution and laws of the United States. Pursuant to this plan, the defendants have allegedly prosecuted and threatened to prosecute the plaintiffs and other members of the class they represent under color and authority of certain statutes of the state of Illinois and certain ordinances of the City of Chicago. It is alleged that certain plaintiffs and other members of the class have been arrested without warrants of any kind or probable cause while peacefully demonstrating, that prosecutions based on these statutes and ordinances have been instituted against these plaintiffs and that they have been held on unreasonable and

---

1. Landry et al. v. Daley et al., D.C. 280 F.Supp. 929, p. 934, 67 C 1863, opinion dated December 28, 1967 (Will, J.).

exorbitant bail. The complaint asserts that these arrests and prosecutions, as well as threats of future enforcement of the statutes and ordinances, have been made by defendants without any expectation of securing valid convictions, but rather are part of a plan to employ arrest, detention on excessive bail and threats of prosecution to harass plaintiffs and their supporters and to discourage them from asserting and exercising their federal rights.

The complaint also alleges that the state statutes and city ordinances under which this plan or scheme has been effectuated are unconstitutional on their face.[2] It is contended that these statutes and ordinances are overbroad, vague and indefinite, permit a construction which would violate plaintiffs' First Amendment guarantees and fail to meet the requisites of certainty and specificity which are required of criminal statutes under the principles of due process of law.

On the basis of these allegations, the plaintiffs seek: (1) the issuance of declaratory judgments declaring that the state statutes and city ordinances in question are void on their face as violative of the Constitution of the United States, and/or as applied to the conduct of the plaintiffs herein, (2) the issuance of a permanent injunction restraining the defendants, their agents, and attorneys from the enforcement, operation, or execution of any of these statutes and ordinances, and (3) the issuance of a permanent injunction restraining the defendants, their agents and attorneys from impeding, intimidating, hindering and preventing plaintiffs or members and supporters of ACT from exercising the rights, privileges, and immunities guaranteed to them by the Constitution and laws of the United States.

Plaintiffs filed their complaint on October 27, 1967. Simultaneously, they moved that a three-judge court be convened to hear and determine the issues presented therein. Shortly thereafter, both the state and city defendants moved to dismiss, contending, *inter alia,* that the complaint failed to disclose a basis for equitable relief and that the doctrine of federal abstention should be utilized to allow the state courts an opportunity to adjudicate the issues presented in the complaint.

An opinion dealing with these motions was issued on December 28, 1967.[3] The defendants' motions to dismiss were denied. The complaint was found to raise several substantial constitutional issues within the competency of a three-judge court and to allege a formal basis for equitable relief. The question of abstention was held to be premature. Plaintiffs' claims regarding the challenged city ordinances, however, were found to be inappropriate for determination by a three-judge court.[4] Accordingly, these claims were severed from the claims involving the state statutes and only the latter have been certified to this tribunal.

The issues involving the alleged unconstitutional application of the challenged state statutes have been held in abeyance pending determination of the constitutionality of the statutes themselves. Briefs addressed to the latter issue have been submitted by the parties, and a hearing on these issues was held on January 27, 1968.

---

2. The state statutes listed in the complaint are: Ill.Rev.Stat., Ch. 38, § 25–1 (Proscribing "Mob Violence"); Ill.Rev.Stat., Ch. 38, § 31–1 (Proscribing "Resisting or Obstructing a Peace Officer"); Ill. Rev.Stat., Ch. 38, § 12–2 (Proscribing "Aggravated Assault") ; Ill.Rev.Stat., Ch. 38, § 12–4 (Proscribing "Aggravated Battery"); Ill.Rev.Stat., Ch. 38, § 12–6 (Proscribing "Intimidation").

 The city ordinances listed in the complaint are: Municipal Code of Chicago, Ch. 11, § 33 (Proscribing "Obstructing or Resisting a Police Officer"); Municipal Code of Chicago, Ch. 193, § 1 (Proscribing "Disorderly Conduct").

3. Landry et al. v. Daley et al., D.C. 280 F.Supp. 929, 67 C 1863, opinion dated December 28, 1967 (Will, J.).

4. Id. at 17–19.

Plaintiffs have abandoned their challenges to the constitutionality of the Illinois "Aggravated Assault"[5] and "Aggravated Battery"[6] statutes. The remaining statutes are: the Illinois "Mob Violence" statute,[7] the Illinois "Intimidation" statute,[8] and the Illinois statute proscribing "Resisting or Obstructing a Peace Officer."[9] Plaintiffs assert that these statutes are unconstitutional on their face for reasons of overbreadth, vagueness and indefiniteness.

### The Question of Federal Forbearance

The defendants have reasserted the arguments which they raised in their earlier motion to dismiss. They point out that certain of the plaintiffs currently face prosecution in the state courts for violations of the statutes challenged and that these plaintiffs have not asserted any constitutional attack upon any of these statutes in those criminal proceedings, even though such an attack is readily available under Illinois law and procedure. They argue that the plaintiffs have adequate remedies available to them in the state courts and that the mere possibility of an erroneous application of constitutional standards by these courts does not amount to irreparable injury of such a nature as to justify equitable relief. It is also argued that federal declaratory and injunctive relief would be disruptive of the orderly administration of the state courts. Defendants contend, therefore, that this is a proper case for federal abstention.

5. Ill.Rev.Stat., Ch. 38, § 12–2.

6. Ill.Rev.Stat., Ch. 38, § 12–4.

7. Ill.Rev.Stat., Ch. 38, § 25–1.

8. Ill.Rev.Stat., Ch. 38, § 12–6.

9. Ill.Rev.Stat., Ch. 38, § 31–1.

10. See Note, 75 Yale L.J. 1007 (1966).

11. See, e.g., Cleary v. Bolger, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390 (1962); Pugach v. Dollinger, 365 U.S. 458, 81 S. Ct. 650, 5 L.Ed.2d 678 (1960), affirming 277 F.2d 739 (2d Cir.); Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1942).

The defendants' contentions rest on the premise that the principle of federalism requires that a federal district court forbear from direct interference with local law enforcement proceedings. Interference of the nature contemplated herein, it is argued, is destructive of state sovereignty and, hence, jeopardizes our federal system. An ultimate determination of these questions by the state courts, defendants admit, is subject to Supreme Court review. They distinguish such review from federal action at the present time, since the autonomy of local institutions would not be affected immediately and directly.

■■■ While state autonomy is a basic consideration, it is not the only one. Federalism is also designed to check local abuse of essential individual rights arising under the Constitution and laws of the United States.[10] The state courts have a duty to preserve these rights, and it has been generally assumed that they will fulfill this duty. The doctrine of abstention has often been invoked in order to avoid federal interference with state criminal prosecutions.[11] Similarly, limitations on federal equitable relief have been rigorously applied on numerous occasions to achieve the same result.[12] Deference to the interests and autonomy of the states, however, does not forbid all prior restraint of state criminal proceedings or independent inquiry by a federal tribunal into questions inherently linked with the enforcement of state laws.[13] The federal courts are vested with the primary

12. See, e.g., Cleary v. Bolger, supra note 12; Douglas v. City of Jeannette, supra note 12, 319 U.S. at 161–165, 63 S.Ct. at 880, 881; Beal v. Missouri Pacific R.R. Corp., 312 U.S. 45, 49–51, 61 S.Ct. 418, 85 L.Ed. 577 (1941); Spielman v. Motor Sales Co., 295 U.S. 89, 95–97, 55 S.Ct. 678, 79 L.Ed. 1322 (1935).

13. See, Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Carmichael v. Allen, 267 F.Supp. 985 (N.D. Ga.1967).

responsibility of vindicating federal rights.[14] Where state statutes or state conduct allegedly impair rights guaranteed by the Constitution and particularly the First Amendment thereto, federal deference to state tribunals ultimately depends on whether these tribunals can adequately preserve the federal rights of the individual.[15] As is apparent from recent decisions of the United States Supreme Court and inferior federal courts, the fact that constitutional defenses may be raised in state court criminal proceedings does not in and of itself compel or even permit abstention.

In Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), for example, the Supreme Court clearly dispelled any notion that federalism requires automatic deference to state courts. *Dombrowski* involved a civil action seeking declaratory and injunctive relief from threatened prosecution under a state anti-subversive statute. The plaintiff alleged, first, that the prosecution was instituted in bad faith solely to discourage civil rights activities and, second, that the statute was an unconstitutionally vague regulation of freedom of expression. The district court dismissed, applying traditional equitable limitations on a federal court's power to enjoin state criminal proceedings and also the doctrine of abstention.[16]

On appeal, the Supreme Court reversed, indicating that either ground, if proven, justified federal equitable relief. The Court stated,

> [t]he allegations in this complaint depict a situation in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights. They suggest that a substantial loss or impairment of

freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in this Court of any adverse determination. These allegations, if true, clearly show irreparable injury. 380 U.S. at 485–486, 85 S.Ct. at 1120.

The Court also held that federal abstention was improper "where * * * statutes are justifiably attacked on their face as abridging free expression or as applied for the purpose of discouraging protected activities." Id. at 489–490, 85 S.Ct. at 1122. The controlling consideration on the abstention issue, as on the question of equitable relief, was the inability of the state court proceedings to assure expeditious vindication of federal rights. Id. at 490–492, 85 S.Ct. 1116. Cf. Cameron v. Johnson, 381 U.S. 741, 755, 85 S.Ct. 1751, 14 L.Ed.2d 715 (1965) (dissenting opinion).

In Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), the Supreme Court again indicated that the federal courts may not defer to the state courts where deference is likely to result in a substantial impairment of federal rights. The appellant in *Zwickler* had sought injunctive and declaratory relief in a federal district court from threatened enforcement of a state statute making it unlawful to distribute anonymous political handbills. Appellant contended that this statute was an overbroad regulation of expression. A three-judge district court applied the abstention doctrine, reasoning that abstention was justified where there were no "special circumstances" entitling plaintiff to an injunction against criminal prosecution.[17]

The Supreme Court reversed the district court and remanded the cause, concluding that irrespective of the propriety

---

14. Zwickler v. Koota, 389 U.S. 241, 251, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

15. See, Zwickler v. Koota, supra note 14 at 249–252, 88 S.Ct. 391; Dombrowski v. Pfister, supra note 14; Cf. Cameron v. Johnson, 381 U.S. 741, 748–749, 755–756, 85 S.Ct. 1751, 14 L.Ed.2d 715, 755 (1965) (dissenting opinions). See, also, Brewer, *Dombrowski v. Pfister: Federal Injunc-*

tions Against State Prosecutions in Civil Cases—A New Trend in Federal-State Judicial Relations, 34 Fordham L.Rev. 71, 90–91 (1965); Note, 75 Yale L.Rev. 1007, 1033–34 (1966).

16. Dombrowski v. Pfister, 227 F.Supp. 556, 562–563 (E.D.La.1964).

17. Zwickler v. Koota, 261 F.Supp. 985, 993 (E.D.N.Y.1966).

of federal injunctive relief, it was inappropriate to abstain from declaratory relief.[18] In its opinion, the Court pointed out that the claimed constitutional infirmity was overbreadth and that no state court construction could obviate this vice. Federal forbearance, it reasoned, would result in delay during which the valid exercise of First Amendment rights might be inhibited.[19] Under such circumstances, it concluded that the federal courts have a duty to provide a federal forum for at least declaratory clarification of the federal claim.[20]

The principles announced by the Supreme Court in *Dombrowski* and *Zwickler* appear clearly applicable in the instant case. Plaintiffs claim that statutes invalid because of vagueness, indefiniteness and overbreadth have been used by defendants in furtherance of a scheme to discourage plaintiffs' legitimate exercise of First Amendment rights. In *Dombrowski*, the Court indicated that defense in a state criminal prosecution is not sufficient to correct either of these evils. Arrest, detention, and threats of prosecution may have an *in terrorem* effect on free expression. Where prosecutions are instituted in bad faith in furtherance of a scheme to discourage protected activities, the ultimate success of the defendant does not alter the impropriety of the unconstitutional scheme.[21] The adjudication simply resolves the guilt or innocence of the defendant; it

does not purge the scheme of its impact upon federally protected rights.[22]

Similarly, the possible application of a vague, uncertain, or overbroad statute regulating freedom of expression may have an inhibiting effect on the valid exercise of freedom of expression. Where prosecution is instituted under such a statute and its provisions are not susceptible to clarification in a single prosecution, defense in a state criminal proceeding is likely to lead to piecemeal construction resolving only the uncertainty of the defendant with no likelihood of obviating similar uncertainty for others.[23] Those affected or potentially affected by such a statute, however, are entitled to be free from the burden of resolving its uncertainty through state prosecutions.[24]

Defendants contend that the conduct of the plaintiffs who are facing state prosecution is "hard core conduct" which would obviously be prohibited under a narrow and clearly constitutional construction of the statutes. Hence, they argue, federal equitable relief is completely unwarranted. But even assuming arguendo that equitable relief is unwarranted, this does not, as *Zwickler* holds, obviate plaintiffs' right to declaratory relief. Moreover, the class also includes plaintiffs who do not now face prosecution. The statutes in dispute are challenged on grounds of overbreadth, as well as vagueness.[25] *Zwickler* indicates that

18. 389 U.S. 241, 254–255, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

19. Id. at 249–252, 88 S.Ct. 391.

20. Id. at 245–248, 251–252, 88 S.Ct. 39.

21. 380 U.S. at 490, 85 S.Ct. 1116, 14 L.Ed. 2d 22.

22. Although *Dombrowski* dealt only with the bad faith enforcement of statutes regulating speech, commentators have suggested that its holding is not limited to the First Amendment area. See, Brewer, Dombrowski v. Pfister: Federal Injunctions Against State Prosecutions in Civil Rights Cases—A New Trend in Federal-State Judicial Relations, 34 Fordham L.Rev. 71 (1965); Note, 75 Yale L.Rev. 1007, 1033–34 (1966). Cf. Bailey, Enjoining State Criminal Prosecutions Which

Abridge First Amendment Freedoms, 3 Harv.Civ.Rights Lib.L.Rev. 67 (1967).

23. See 380 U.S. at 490–492, 85 S.Ct. 1116. See, also, Cameron v. Johnson, 381 U.S. 741, 755, 85 S.Ct. 1751 (1967) (dissenting opinion).

24. 380 U.S. at 491, 85 S.Ct. 1116.

25. It should be noted that *Dombrowski* specifically held that federal abstention is inappropriate where a statute regulating expression is challenged on grounds of vagueness. 380 U.S. at 489–490, 85 S.Ct. 1116. Normally, the state must assume the burden of obtaining a permissible narrow construction by way of a declaratory judgment proceeding, if it wishes to avoid a federal proceeding. Id. at 491, 85 S.Ct. 1116. There is an ex-

under such circumstances a federal court has a duty to adjudicate the federal claims which are before it and to render declaratory relief one way or the other.[26]

### The Applicable Constitutional Principles

As noted earlier, this suit arises out of the application and threatened future application of certain Illinois statutes and ordinances of the City of Chicago to plaintiffs' civil rights activities. The claims regarding the application of the city ordinances do not pose a proper question for a three-judge court and have been severed from the instant proceeding for consideration by a single judge. The plaintiffs' claims in regard to the remaining state statutes are, first, that these statutes have been applied in bad faith, solely for the purpose of discouraging their civil rights activities, and, second, that the Illinois "Mob Action" statute, "Resisting Arrest" statute, and "Intimidation" statute are unconstitutionally uncertain both for reasons of vagueness and overbreadth. The adjudication of the first grounds has been held in abeyance and the scope of the present inquiry, accordingly, has been limited to the constitutionality of the provisions of the three statutes which plaintiffs assail. Before undertaking any discussion of these specific statutes, however, a brief canvass of the applicable constitutional principles would seem appropriate.

In its most basic sense, the present suit involves the boundaries of state regulation of demonstrations, picketing, mass protest meetings, marches, and similar assemblies. Although demonstrations are distinguishable from other forms of self expression, it is generally recognized that they are within the protection of the First Amendment. There are two basic reasons for this. The first is that the fundamental considerations underlying the rights of free speech and peaceful assembly are also relevant to peaceful demonstration. Peaceful demonstration, like the rights of free speech and peaceful assembly, advances society's interests in a variety of ways. Through peaceful demonstration, individual members of society may express their views and thereby participate in the political apparatus of a democracy. Demonstration, like most conventional means of expression, also assures the disclosure and discussion of the real issues faced by society, thereby making possible rational judgment by the electorate. It provides an outlet for dissenting people, and history reveals that dissentient groups are more likely to adhere to the majority will, if their views have also been aired. Similarly, it provides minorities an opportunity to force re-examination of social institutions, to enlist the sympathy of other citizens, to mobilize supporters and ultimately to strengthen their bargaining position.[27] Ultimately, therefore, peaceful demonstration plays a role

ception to this prescription. Where a readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution, federal forbearance is proper. Id. at 491, 85 S. Ct. 1116. It is apparent, however, that this exception applies only if the entire statute is amenable to correction in one prosecution where all the vagueness and overbreadth will be eliminated. Bailey, Enjoining State Criminal Prosecutions Which Abridge First Amendment Freedoms, 3 Harv.Civ.Rights-Civ.Lib.L.Rev. 67, 90 (1967).

The plaintiffs in the present suit challenge three different state statutes on both grounds of vagueness and overbreadth. One of these statutes, the Intimidation statute, is not involved in any of the prosecutions currently pending in the state courts. It is obvious, therefore, that the present suit does not come within the exception recognized in *Dombrowski*.

26. See 389 U.S. at 249–250, 253–254, 88 S.Ct. 391. It should also be noted that the normal rules of standing are relaxed in the area of First Amendment freedoms. Defendants under criminal prosecution are permitted to challenge overbroad statutes on their face, without demonstrating that their own conduct could not constitutionally have been proscribed by a different and more precise enactment. See Thornhill v. State of Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

27. See Note, 80 Harv.L.Rev. 1773 (1967).

in the maintenance of a balance between stability and change in society, very much like other First Amendment rights.

The second reason is that peaceful demonstration is a practical means of political protest.[28] More conventional means of self-expression often are of little real utility to political minorities. The instruments of mass media may be beyond their financial resources and political leaders may turn a deaf ear to persons who are unpopular with, or unknown to, the general public. A demonstration, therefore, may be the only effective means by which a minority can publicize a message or reach a desired audience.[29]

 Demonstrations will sometimes, however, conflict with various other legitimate state interests. In such instances, their societal value must be subordinated to other values and considerations. Perhaps the most important countervailing consideration is the state's interest in preventing physical violence or abuse of property. Thus, demonstrations lose their constitutional protection if the participants engage in violence.[30] And, under certain circumstances, conduct short of violence may also subject demonstrators to arrest or dispersal. For instance, provocative conduct or language which undertakes incitement to riot may also lead to loss of constitutional protection.[31] Other state interests which have been held to justify similar regulation of demonstrations include the maintenance of the free flow of traffic [32] and the prevention of substantial interference with government operations or the regular use of public property.[33]

 Although the Supreme Court has indicated that demonstrations are subject to greater state regulation than "pure speech," [34] it seems clear that the state may only impose "reasonable" restrictions on time, place, duration, or

28. See Adderley v. State of Florida, 385 U.S. 39, 50–51, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (dissenting opinion).

29. Note, 80 Harv.L.Rev. 1773 (1967).

30. See, e.g., Feiner v. State of New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 267 (1951); Pritchard v. Davis, 326 F.2d 323 (1964); Note, 80 Harv.L.Rev. 1773, 1774–75 (1967).

31. See Feiner v. State of New York, 340 U.S. 315, 321, 71 S.Ct. 303, 95 L.Ed. 267 (1951); Chaplinsky v. State of New Hampshire, 315 U.S. 568, 573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Although the Supreme Court accorded protection to "boisterous," "loud," and "flamboyant" conduct in Edwards v. South Carolina, 372 U.S. 229, 233, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), even noisy conduct may justify restrictions on demonstrations under some circumstances. See Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949).

32. E.g., Farmer v. Moses, 232 F.Supp. 154 (S.D.N.Y.1964); Clemons v. Congress of Racial Equality, 201 F.Supp. 737 (E.D. La.1962). See, also, Cox v. State of Louisiana, 379 U.S. 536, 554–555, 85 S. Ct. 453, 13 L.Ed.2d 471 (1965).

33. See Adderley v. State of Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); United States v. Aarons, 310 F. 2d 341 (2d Cir. 1962); Frend v. United States, 69 App.D.C. 281, 100 F.2d 691 (D.C.Cir.) cert. denied, 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040 (1938). See, also, Brown v. State of Louisiana, 389 U.S. 131, 157, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (dissenting opinion); Cox v. State of Louisiana, 379 U.S. 536, 561–564, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). Other state interests which might justify restrictions on demonstrations in some circumstances would seem to include the interests of protecting individual privacy and private property. See Kamin, Residential Picketing and the First Amendment, 61 N.W.L.Rev. 177 (1966); Note, 80 Harv.L.Rev. 1773, 1777–80 (1967).

34. See Cox v. State of Louisiana, 379 U.S. 536, 555, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). For instance, a distinction between "pure speech" and "speech plus" might be drawn. See Kalvin, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct.Rev. 1, 22–25 (1965). This distinction, however, would seem to merely point out that certain state interests may conflict with the right to demonstrate and other forms of "speech plus" to a greater extent than with "pure speech."

manner.[35] The reasonableness of a regulatory measure must necessarily be viewed in terms of the competing interests of the demonstrators and the state. In cases where the reasonableness of the application of a regulatory measure is challenged, this question ultimately depends upon the balance of a number of factors: the gravity of the evil which the state seeks to prohibit, the probability of the evil, the conduct and intent of the demonstrators, the circumstances of the demonstration, and the alternatives open to the government which infringe upon the demonstrator's interests to a lesser extent.[36] In cases where the reasonableness of the regulatory measure itself is challenged, as in the present case, the constitutionality of the regulation turns upon its certainty and its breadth.[37]

The cases in this latter category actually involve two distinct concepts: (1) vagueness or indefiniteness, and (2) overbreadth.[38] These questions frequently overlap in any given case and are often loosely referred to in the aggregate as the "vagueness doctrine." Their application, however, is based on different constitutional principles.

▮▮▮▮▮▮ The concept of vagueness or indefiniteness rests on the constitutional principle that procedural due process requires fair notice and proper standards for adjudication. The primary issues involved are whether the provisions of a penal statute are sufficiently definite to give reasonable notice of the prohibited conduct to those who wish to avoid its penalties and to apprise judge and jury of standards for the determination of guilt.[39] If the statute is so obscure that men of common intelligence must necessarily guess at its meaning and differ as to its applicability, it is unconstitutional.[40]

▮▮▮▮▮▮ The concept of overbreadth, on the other hand, rests on principles of substantive due process which forbid the prohibition of certain individual freedoms. The primary issue is not reasonable notice or adequate standards, although these issues may be involved. Rather the issue is whether the language of the statute, given its normal meaning, is so broad that its sanctions may apply to conduct protected by the Constitution.[41] Frequently, the resolution of this issue depends upon whether the statute permits police and other officials to wield unlimited discretionary powers in its enforcement.[42] If the scope of the

---

35. See Cox v. State of Louisiana, 379 U.S. 536, 558, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

36. See Yates v. United States, 354 U.S. 298, 318–327, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); Dennis v. United States, 341 U.S. 494, 508–511, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). See, also, Mendelson, Clear and Present Danger Test—From Schenck to Dennis, 52 Colum.L.Rev. 313 (1952); Richardson, Freedom of Expression and the Function of Courts, 65 Harv. L.Rev. 1 (1951); Note, 71 Harv.L.Rev. 85, 123–25 (1957).

37. See, Ashton v. Kentucky, 384 U.S. 195, 200–201, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966); Shuttlesworth v. City of Birmingham, 382 U.S. 87, 93–95, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965); Baggett v. Bullitt, 377 U.S. 360, 373–374, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Edwards v. South Carolina, 372 U.S. 229, 237–238, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); N.A.A.C.P. v.

Button, 371 U.S. 415, 416, 432–438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

38. See, generally, Collings, Unconstitutional Uncertainty—An Appraisal, 40 Cornell L.Rev. 195 (1955). Cf. Amsterdam, The Void-For-Vagueness Doctrine In The Supreme Court, 109 U.Penn.L.Rev. 67 (1960).

39. See Collings, supra note 38 at 196–97.

40. E.g., Baggett v. Bullitt, 377 U.S. 360, 367–378, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Cramp v. Board of Public Instruction, 368 U.S. 278, 287, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); Lanzetta v. State of New Jersey, 306 U.S. 451, 453, 59 S. Ct. 618, 83 L.Ed. 888 (1939).

41. See Collings, supra note 38 at 196–97.

42. See, e.g., Ashton v. Kentucky, 384 U.S. 195, 200–201, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966); Shuttlesworth v. City of Birmingham, 382 U.S. 87, 90–92, 86 S.Ct. 211, 15 L.Ed.2d 377 (1965); Edwards v.

power permitted these officials is so broad that the exercise of constitutionally protected conduct depends on their own subjective views as to the propriety of the conduct, the statute is unconstitutional.[43]

These concepts have particular relevance to statutes touching upon the areas of free speech and assembly. Although the state may regulate speech and assembly where the exercise of these rights conflicts with certain state interests, it may regulate only to the extent necessary to discharge these interests.[44] A vague or overbroad statute, however, is likely to have a deterrent effect which is beyond that necessary to fulfill the state's interests. Rather than chance prosecution, people will tend to refrain from speech and assembly which might come within the statute's ambit.[45]

Such a deterrent effect on the exercise of these rights is impermissible under the First Amendment.[46] The Amendment was designed not only to protect these rights, but also to encourage their use. Consequently, the requirements of clarity, definiteness, and narrow scope are most strictly observed when a statute places a possible limitation upon First Amendment rights.[47] Such scrutiny is necessary to provide a buffer between the valid exercise of the police power by the state and excessive restriction of the free dissemination of ideas.[48]

A number of factors are taken into consideration in determining whether a state regulation meets these standards of clarity and narrowness. Among them are: (1) whether a substantial interest worthy of protection is identified or apparent from the language of the statute;[49] (2) whether the terms of the regulation are susceptible to objective measurement by men of common intelli-

South Carolina, 372 U.S. 229, 237–238, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

43. See, e.g., Shuttlesworth v. Birmingham, 382 U.S. 87, 90, 86 S.Ct. 211, 15 L.Ed.2d 377 (1965); N.A.A.C.P. v. Button, 371 U.S. 415, 433, 435–436, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). See, also, Amsterdam, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U. of Pa.L.Rev. 67, 75–76, 80–81, 96–104 (1960). Cf. Baggett v. Bullitt, 377 U.S. 360, 371, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Smith v. People of State of California, 361 U.S. 147, 151, 80 S.Ct. 215, 4 L.Ed.2d 205 (1961).

44. See De Jonge v. State of Oregon, 299 U.S. 353, 365–366, 57 S.Ct. 255, 81 L.Ed.2d 278 (1937); Stromberg v. People of State of California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); Cf. Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957).

45. Dombrowski v. Pfister, 380 U.S. 479, 486–489, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); N.A.A.C.P. v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Winters v. People of State of New York, 333 U.S. 507, 519–520, 68 S.Ct. 665, 92 L.Ed. 840 (1948); Thornhill v. State of Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Herndon v. Lowry, 301 U.S. 242, 261–262, 57 S.Ct. 732, 81 L.Ed. 1066 (1937).

46. See, e. g., Dombrowski v. Pfister, supra at 494–496, 85 S.Ct. 1116; Freedman v. State of Maryland, 380 U.S. 51, 59–60, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); N.A.A.C.P. v. Button, supra 371 U.S. at 437, 83 S.Ct. 328; Thornhill v. State of Alabama, supra 310 U.S. at 101–106, 60 S.Ct. 736.

47. E. g., Keyishian v. Board of Regents, 385 U.S. 589, 603–604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Cox v. State of Louisiana, 379 U.S. 536, 551–552, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Edwards v. South Carolina, 372 U.S. 229, 237–238, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Cramp v. Board of Public Instruction, 368 U.S. 278, 287–289, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961).

48. This rationale has been described most succinctly by Mr. Justice Brennan for the Court in N.A.A.C.P. v. Button, 371 U.S. at 433, 83 S.Ct. at 338: "These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. * * * Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity. See, also, Amsterdam, supra note 43 supra.

49. See Note, 80 Harv.L.Rev. 1773, 1788 (1967).

gence;[50] (3) whether those charged with its enforcement are vested only with limited discretion;[51] (4) if penal, whether some element of knowledge or intent to obstruct a state interest is required;[52] and (5) whether its clarity is dependent upon manifold cross-reference to inter-related enactments or regulations.[53]

### The Mob Action Statute

Plaintiffs contend that the Illinois Mob Action statute, Ill.Rev.Stat. Ch. 38, § 25–1, is void for both reasons of vagueness and overbreadth. It provides:

(a) Mob action consists of any of the following:

(1) The use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law; or

(2) The assembly of 2 or more persons to do an unlawful act; or

(3) The assembly of 2 or more persons, without authority of law, for the purpose of doing violence to the person or property of any one supposed to have been guilty of a violation of the law, or for the purpose of exercising correctional powers or regulative powers over any person by violence.

(b) Any person engaged in mob action shall be fined not to exceed $500 or imprisoned in a penal institution other than the penitentiary not to exceed 30 days, or both.

(c) Any participant in a mob action which shall by violence inflict injury to the person or property of another shall be fined not to exceed $1,000 or imprisoned in a penal institution other than the penitentiary not to exceed one year, or in the penitentiary from one to 5 years, or both fined and imprisoned.

(d) Any participant in a mob action who does not withdraw on being commanded to do so by any peace officer shall be fined not to exceed $500 or imprisoned in a penal institution other than the penitentiary not to exceed one year, or both.

This statute is a section of the Illinois Criminal Code of 1961. It represents a compilation of the prior criminal offenses of route, riot, affray, unlawful assembly and mob action.[54] The statute has not been construed by the Illinois courts. Under these circumstances, we must place our own construction on the statute, giving the words their reasonable and natural meaning.

The statute proscribes three separate categories of conduct as "Mob Ac-

---

50. See Keyishian v. Board of Regents, 385 U.S. 589, 604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). See, also, authorities cited in note 40 supra and accompanying text.

51. Compare Cox v. State of New Hampshire, 312 U.S. 569, 575–576, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); with, Shuttleworth v. Birmingham, 382 U.S. 87, 90–92, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

52. See Adderley v. State of Florida, 385 U.S. 39, 42–43, 87 S.Ct. 242, 17 L.Ed.2d 149 (1967). See, also, Cox v. State of Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), wherein a Louisiana statute regulating picketing in or near a court house "with intent to interfere" with the administration of justice was upheld as valid on its face. On other occasions, the Supreme Court when holding a statute unconstitutional has emphasized the fact that the law reached

innocuous acts. Keyishian v. Board of Regents, 385 U.S. 589, 599–601, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Baggett v. Bullitt, 377 U.S. 360, 368–372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). Moreover, the Supreme Court has held on a number of occasions that a conviction based upon membership in a group which pursues illegal ends requires a specific intent to further such ends. See Elfbrant v. Russell, 384 U.S. 11, 19, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); Cramp v. Board of Public Instruction, 368 U.S. 278, 285–287, 82 S.Ct. 275, 7 L.Ed.2d 285 (1964); Noto v. United States, 367 U.S. 290, 299–300, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961). Cf. Collings, supra note 38 at 227–231.

53. See Keyishian v. Board of Regents, 385 U.S. 589, 604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

54. Ill.Rev.Stat.Ann. ch. 38, § 25–1 (Smith-Hurd 1964) (Committee Comments).

tion." Since these provisions are not interdependent and the validity of the statute as a whole would not rest on any one of them,[55] we shall examine each separately.

Subparagraph (1) (a) proscribes:

The use of force or violence disturbing the public peace by two or more persons acting together and without authority of law.

It is obvious that this provision was designed for the protection of persons and property and for the maintenance of public order. It cannot be questioned that the state of Illinois has an interest in preventing physical violence to persons or abuse to private or public property. Indeed, the constitutional guarantee of liberty presupposes the existence of an orderly society, wherein grievances and disputes are settled by peaceful means rather than force and violence. This is a sufficiently strong state interest to justify regulation of certain demonstrations.

Although this provision resembles breach-of-peace statutes, it is not so vague or indefinite as to be invalid. The use of "force or violence" is specifically required. The words "force" and "violence" are not so obscure as to fail to advise the public of the prohibited conduct. In common parlance, force means "power, violence, compulsion, or constraint exerted upon or against a person or thing."[56] The word "violence" imparts a similar meaning. It means "the exertion of any physical force so as to in-

jure or abuse."[57] "Force," "violence," "compulsion," "constraint," and "restraint" convey a similar idea of the exertion of power against the will, wish or consent of another.[58] Given a reasonable and natural construction, these terms connote either physical attack upon person or property, or physical aggression reasonably capable of inspiring fear of injury or harm to a person or property. We believe it is apparent, then, that a reasonable interpretation of this provision precludes its applicability to the peaceful exercise of the rights of free speech and assembly.

The statute further requires that two or more persons be "acting together" and "without authority of law." We see no ambiguity in the phrase "acting together." In the context of this provision, it conveys combined, conjoint or concerted action. The phrase "without authority of law" is apparently designed to limit the scope of the enactment by excepting those situations in which the law recognizes a justifiable use of force, such as by police officers, to the extent reasonably necessary to effect an arrest; by persons acting in self-defense, etc.[59] While for reasons explained later herein, the phrase lacks some clarity, this would not seem fatal to this provision.

Similarly, subparagraph (a) (1) does not seem susceptible to an overbroad application. The use of force or violence is specifically required before it is applicable.[60] It proscribes only non-peaceful

---

55. See Ill.Rev.Stat.Ann. ch. 38, § 34–2 (Smith-Hurd 1964).

56. Webster, New International Dictionary p. 3a (3d ed. 1963 Unabridged). It is also defined as "violence or such threat or display of physical aggression toward a person as reasonably inspires fear of pain, bodily harm, or death. Id. at p. 3c.

57. Webster, New International Dictionary p. 1a (3d ed. 1963 Unabridged).

58. People v. McIlvain, 55 Cal.App.2d 322, 130 P.2d 131, 134 (2d Dist. 1942).

59. See Ill.Rev.Stat.Ann. Ch. 38, § 7–1 et seq. (Smith-Hurd 1964)

60. Although the standard breach-of-peace statute may be so broad and all-embracing

that its constitutionality becomes doubtful, the crucial defect stressed by the Supreme Court in both Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), and Edwards v. South Carolina, 372 U.S. 229, 237, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), was the use of such a statute against peaceful conduct. In Cox, however, the Court seemed to suggest that breach-of-peace statutes may still be used to convict demonstrators who are either violent or past the bounds of argument. 279 U.S. at 551–552, 85 S.Ct. 453. Note, 80 Harv.L.Rev. 1773, 1783 (1967). Clearly, therefore, where the statute itself requires violence, it would appear to be constitutional.

demonstrations and is not suggestive of a vehicle for the suppression of ideas. Moreover, the use of force or violence carries with it *sub silentio* a destructive or threatening intent. Furthermore, the scope of the provision is narrowed by the requirements that the persons to which it is applicable be "acting together" and "without authority of law." Even without the latter phrase, this provision reaches only a narrow scope of conduct which is not protected by the First Amendment.

■ Subparagraph (a) (2) proscribes:

The assembly of 2 or more persons to do an unlawful act; or

The revisor's note to the Illinois Criminal Code of 1961 indicates that this provision incorporates the common-law offense of "unlawful assembly." [61] We do not doubt that the state of Illinois has a valid interest in preventing a project which will breach its criminal laws. However, the language of subparagraph (a) (2) is not so limited. This provision proscribes an assembly to do an "unlawful act." The phrase "unlawful act" in its normal meaning is not limited to criminal illegality; it includes city regulatory ordinances, quasi-criminal ordinances, torts, or other civil wrongs.[62] This implies protection of other state interests which are not readily apparent, and which may not justify suppression of speech or assembly.

This provision certainly goes beyond narrowly drawn statutes "concerning the time, place, duration, or manner of use of the streets for public assemblies." [63] Moreover, the phrase "unlawful act" fails to apprise the public of the prohibited conduct. Men of ordinary intelligence have no way of ascertaining what breach

of criminal or civil law may subject them to arrest and prosecution.

Under a literal application of the section, a wide variety of conduct which would at most constitute a misdemeanor or which might involve no criminal act at all but which would be "unlawful" merely in a civil sense becomes felonious if two or more persons gather together to perform it. Moreover, the language apparently would make the act of assembling to contemplate or consider "unlawful" conduct a crime even though the project was ultimately abandoned and the "unlawful" acts never performed.

Perhaps this provision's greatest vice is that it is a ready vehicle for the suppression of ideas. Failing as it does to define what constitutes an "unlawful act," it leaves too much to the calculation of its enforcer. If the ideas portrayed by demonstrators do not coincide with the subjective views of police, any technical violation of either civil or criminal law may be invoked to suppress a demonstration.[64] The "potential for arbitrarily suppressing First Amendment liberties" is all too clear. Shuttleworth v. City of Birmingham, 382 U.S. 87, 90–91, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965). In light of the protection afforded peaceful assembly by the First Amendment, we conclude that this provision is impermissively vague and overbroad.

■ Subparagraph (a) (3) proscribes:

The assembly of 2 or more persons, without authority of law, for the purpose of doing violence to the person or property of any one supposed to have been guilty of a violation of the law, or for the purpose of exercising correctional powers or regulative powers over any person by violence.

---

61. Ill.Rev.Stat.Ann. Ch. 38, § 25–1 (Smith-Hurd 1964) (Committee Comments)

62. For instance, the phrase "unlawful act" may be contrasted with the term "offense." This latter term is specifically defined as and limited to the "violation of any penal statute of the state." Ill. Rev.Stat. Ch. 38, § 2–12 (1967).

63. See Cox v. State of Louisiana, 379 U.S. 536, 558, 85 S.Ct. 453, 466, 13 L.Ed.2d 471 (1965).

64. In this sense, it is similar to the statutes which were overturned in Cox v. State of Louisiana, 379 U.S. 536, 555–557 (1965) and Edwards v. South Carolina, 372 U.S. 229, 233–237, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

The gist of this offense is "the exercise by violence of purported correctional power." [65] It is readily apparent that this provision is designed to protect persons and their property who are accused of crime or otherwise subject to public wrath.[66] Thus, it involves, not only the interest of protecting persons and property, but also the interest of preventing the usurpation of the police powers by unauthorized groups. These interests are sufficiently strong to justify regulation of such demonstrations.

This provision contains no patent ambiguities. The word "assembly" has a definite connotation in every day conversation as meaning "a company of persons collected together in one place for some common purpose." [67] The phrase "without lawful authority" obtains meaning from the purpose and context of the provision. It excludes police and other officials who can legally exercise the police power. Similarly, the word "violence" as noted above, conveys a commonly understood meaning and as used herein connotes either physical attack upon person or property, or physical aggression reasonably capable of inspiring fear of injury or harm.

*Amici curiae* urge that this provision is invalid for vagueness because it includes an assembly "for the purpose of exercising correctional powers or regulative powers over any person." Rather than broadening the scope of the provision, however, this language limits it. When the last two words "by violence" are included, it clearly proscribes only an assembly for the purposes of administering punishment to or exercising coercion upon a person by physical force.

Given a reasonable and natural construction, therefore, this provision does not fail to provide fair notice or adequate standards.

■ Likewise, the section poses no problems of scope. It is directed only at conduct which endangers persons or property and which usurps the role of the state. It requires specific intent, i. e., an intent to do violence to a person or his property or an intent to exercise corrective powers or regulatory powers over a person by violence. The use of the word "assembly" requires that this intent be shared by members of the group. These standards clarify and narrowly limit the scope of the section. Normally construed and properly applied, this provision is neither vague nor overbroad.

The "Mob Action" statute also promulgates three penalties for the conduct proscribed therein. *Amici curiae* suggest that the language used in each of these provisions is ambiguous when read in reference to the proscribed conduct. For purposes of clarity, the effect of each of these provisions will be considered separately. Sub-section (b) provides penalties in regard to "any person engaged in mob action." The basic question is how the phrase "engaged in" is to be read in reference to subparagraphs (a) (1) and (a) (3). The word "engage" has a common, well-understood import. It means "to occupy, to employ, or to involve." [68] When the phrase "any person engaged in" is read in conjunction with subparagraph (a) (1) a clear and narrow meaning emerges; any person occupied in or employed in the use of force or violence is subject to penalty. This meaning poses no problems of breadth or clarity.

65. Ill.Rev.Stat.Ann. Ch. 38, § 25–1 (Smith-Hurd 1964) (Committee Comments).

66. The predecessor of this provision was the subject of an opinion in Slaton v. City of Chicago, 8 Ill.App.2d 47, 130 N.E.2d 205 (1st Dist. 1955). As interpreted therein one of the purposes of this provision is "to discourage and prevent interference with the orderly processes of administering the law or powers delegated to the lawful authorities, and the usurpa-

tion of those powers, wholly or in part, by unauthorized groups of persons for what they wrongfully assume to be a collective or community interest." Id. at 57, 130 N.E.2d at 210. See, also, Anderson v. City of Chicago, 313 Ill.App. 616, 40 N.E.2d 601 (1st Dist. 1942).

67. Webster, New International Dictionary n. 1a (3d ed. 1964, Unabridged).

68. Webster, New International Dictionary n. 1 (3d ed. Unabridged).

When the phrase "engaged in" is read in conjunction with subparagraph (a) (3) a similarly clear and narrowing meaning is apparent. Any person who is employed or occupied in a group with a common purpose to use violence against a person or property or to punish or coerce a person by violence is subject to penalty. This language is clear and poses no problems of substantive due process.

Subsection (c) provides penalties for "any participant in a mob action which shall by violence inflict injury to the person or property of another." "Participant" is commonly defined as "one that takes part or shares in something with others." [69] Given a reasonable and natural construction, this phrase, when read in conjunction with subparagraph (a) (1), means one who takes part in or shares in the use of force or violence. Similarly, this phrase, when read in conjunction with subparagraph (a) (3), means one who takes part in or shares in a group with a common purpose to use violence against a person or property or to punish or coerce a person by the use of violence. These constructions would seem readily apparent to men of ordinary intelligence.

Nevertheless, the scope and clarity of this provision has been challenged. Implicit in the statute, it is argued, is a distinction between being actually "engaged in" a mob action and being a "participant" in a mob action. The former phrase implies the applicability of the statute to those who actually are involved in a scheme prohibited by subparagraph (a) (3). The latter phrase, it is contended, implies the applicability of the statute to those who are involved to a lesser extent. It is urged that the statute might properly be construed to be applicable to persons who participate in an initially peaceful demonstration, when unbeknown to them or contrary to their desire and intention, other members of the group commit violence inflicting injury during the course of the demonstration. In other words, it is argued that the statute might be applicable to a peaceful member of an assembly who supports the lawful but not unlawful purposes of the assembly. Indeed, it is contended that the word "participant" is so ambiguous that the statute might be applicable to a bystander in close proximity to the violent "mob action."

We need not speculate about the possible implications of the word "participant." As noted earlier, the Mob Action statute is a provision of the Illinois Criminal Code of 1961. It is limited, as are the other statutes in the Criminal Code, by the provisions of Ill.Rev.Stat. ch. 38, § 4–3 (1967).

Section 4–3(a) provides that a person is not guilty of an offense, other than an offense which involves absolute liability, unless with respect to each element described by the statute defining the offense, he acts while having one of the mental states described subsequently in the Code. Section 4–3(b) further provides in pertinent part:

> If the statute does not prescribe a particular mental state applicable to an element of an offense * * *, any mental state defined in Sections 4–4 [defining "Intent"], 4–5 [defining "Knowledge"], or 4–6 [defining "Recklessness"] is applicable.

The Mob Action statute does not involve absolute liability.[70] Therefore, a person cannot be guilty of the conduct proscribed by the Mob Action statute unless he intentionally,[71] knowingly,[72] or recklessly[73] engages in such conduct.

**69.** Webster, New International Dictionary n. 1 (3d ed. Unabridged).

**70.** See Ill.Rev.Stat. ch. 38, § 4–9 (1967).

**71.** A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct. Ill.Rev.Stat. ch. 38, § 4–4 (1967).

**72.** A person knows, or acts knowingly or with knowledge of:
(a) The nature or attendant circumstances of his conduct, described by the statute defining the offense, when he is

**73.** See note 73 on page 958.

These requirements substantially narrow the scope of the offense. They clarify and limit it and supply objective standards for the adjudication of guilt.[74]

▮ Moreover, in light of these requirements it can not be said that the inclusion of the word "participant" in a statute aimed primarily at the use of force and violence vests police with unfettered discretion. Certainly, the interest of the state in preserving the peace requires that police have the discretion to arrest those who utilize force and violence. Thus, the discretion vested in the police by this provision seems to be the type of narrow discretion which the Supreme Court has recognized as the proper role of responsible officials in making determinations concerning the imminence of disorder.[75] In addition, the applicability of this provision is further limited by the phrase "mob action which shall by violence inflict injury to the person or property of another." This phrase restricts the proper exercise of police discretion under this section to those situations in which violence has already erupted. We conclude, therefore, that this provision is sufficiently narrow and specific.

▮ Subsection (d) similarly provides penalties in regard to "any participant in a mob action who does not withdraw on being commanded to do so by any peace officer." *Amici curiae* have also challenged the clarity and scope of this provision, pointing again to the inclusion of the word "participant" and suggesting that it is too vague and broad. As stated above, the requisite mental states which have been incorporated by reference into this provision sufficiently clarify and narrow its scope and preclude its application to peaceful participants or innocent bystanders. The additional requirement of a refusal to withdraw does not subvert this conclusion.[76] On the contrary, it further limits the scope of the enactment as a whole, and the discretion of those charged with its enforcement. It is clear, therefore, that this provision cannot be challenged on these grounds.

▮▮▮ Lest there be any doubt concerning what we conceive to be the nar-

---

consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists.

(b) The result of his conduct, described by the *statute* defining the offense, when he is consciously aware that such result is practically certain to be caused by his conduct.

*Conduct performed knowingly or with* knowledge is performed wilfully, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning. Ill.Rev.Stat. ch. 38, § 4–5 (1967).

73. A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes gross deviation from the standard of care which a reasonable person would exercise in the situation. An act performed recklessly is performed wantonly, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning. Ill.Rev.Stat. ch. 38, § 4–6 (1967).

74. The incorporation in the Mob Action statute of these requisite mental states by reference would not seem defective to the clarity of this statute. The regulatory system established by these five statutes is not so formidably elaborate and complex as to discourage expression by minority groups through fear of a regulatory imbroglio. See Note 80 Harv.L.Rev. 1773, 1778 (1967). This situation is a far cry different from that in *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), where the appellants were confronted by several statutes, numerous regulations and intricate administrative machinery regarding teacher loyalty oaths.

75. See *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) Cf. *Feiner v. People of State of New York*, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 267 (1951).

76. Indeed, in *Cox v. State of Louisiana*, the Supreme Court indicated that such a withdrawal provision is constitutionally permissible if embodied in a statute which is otherwise sufficiently narrow and precise and which protects a justifiable state interest. See 379 U.S. at 551, 85 S.Ct. 453.

row scope of this section as properly interpreted, it does not constitute an offense hereunder for a participant in a peaceful demonstration to refuse to withdraw on command of a peace officer. Peaceful demonstrations do not constitute "mob action" under the statute.

### The Resisting or Obstructing a Peace Officer Statute

Plaintiffs also contend that the Illinois "Resisting Arrest" statute, Ill.Rev.Stat. ch. 38, § 31–1, is void both for reasons of vagueness and overbreadth. It provides:

> A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer of any authorized act within his official capacity shall be fined not to exceed $500 or imprisoned in a penal institution other than a penitentiary not to exceed one year, or both.

This statute has likewise not been construed by the Illinois Courts. We must, therefore, again place our own construction upon it, giving the words their reasonable and natural construction.

 This statute is designed to deter a person from resisting or interfering with the acts of law enforcement officials, simply on the basis of the person's own conclusion as to the impropriety of the act. It thus furthers the legitimate state interest in protecting peace officers, preventing frustration of the valid enforcement of the law, and promoting orderly and peaceful resolution of disputes.[77] It is obvious, therefore, that this statute is not directed at peaceful assembly. Its enforcement, at times, may conflict with assembly, but in such instances, the public interest in discouraging violence and insisting upon the use of peaceful methods of obtaining redress from unlawful acts outweighs the recognition of the feelings of the demonstrators.[78]

 The gist of the offense is "resisting" or "obstructing" the valid acts of a peace officer. These terms convey commonly recognized meanings. "Resisting" or "resistance" means "withstanding the force or effect of" or the "exertion of oneself to counteract or defeat".[79] "Obstruct" means "to be or come in the way of."[80] These terms are alike in that they imply some physical act or exertion. Given a reasonable and natural construction, these terms do not proscribe mere argument with a policeman about the validity of an arrest or other police action, but proscribe only some physical act which imposes an obstacle which may impede, hinder, interrupt, prevent, or delay the performance of the officer's duties, such as going limp, forcefully resisting arrest or physically aiding a third party to avoid arrest.[81]

 The statute further requires that the person resists or obstructs "knowingly" and that the officer be in the performance of an "authorized act within his official capacity." The term "knowingly" is specifically defined in the Criminal Code.[82] It considerably narrows the scope of the enactment by exempting innocent or inadvertent conduct from its proscription. The term "authorized act," although not specifically defined in the Code, is not so obscure that men of common intelligence would differ as to its import. "Authorize" is defined as "to endow with authority or effective legal power, warrant, or right."[83] In the context of the statute the phrase "authorized act," given a reasonable and natural construction, means the legal or legally

---

**77.** Cf. Warner, The Uniform Arrest Act, 28 Va.L.Rev. 316 (1942).

**78.** Cf. Warner, supra note 77 at 330–31.

**79.** Webster, New International Dictionary n. 1 & 2 (3d ed. 1964 Unabridged).

**80.** Webster, New International Dictionary n. 2 (3d ed. 1964 Unabridged).

**81.** Cf. In Re Bacon, 240 Cal.App.2d 34, 49 Cal.Rptr. 322, 333 (1st Dist. 1966).

**82.** See note 72 supra.

**83.** Webster, New International Dictionary n. 4 (3d ed. 1964 Unabridged).

effective acts of an officer.[84] This phrase thus narrows the scope of the offense still further to include only resistance or obstruction of the legal acts of police and other officers.[85] For instance, resistance to an illegal search and seizure would not be proscribed.

Nevertheless, plaintiffs contend that the statute permits police to exercise wholly arbitrary and capricious discretion in regard to group assemblies. Under the language of this statute, they argue, a peace officer need only decree on the spot that the most peaceful assembly be broken up and any failure on the part of a citizen to comply with such an order subjects him to the penalties of this statute. They contend that the *in terrorem* effect on the right of peaceful assembly arising from the potential misapplication of this statute requires, therefore, that it be declared unconstitutional.

This argument is unpersuasive for two reasons. First, the plaintiffs have not given the statute a reasonable construction. It does not proscribe resisting or obstructing an unlawful act of a peace officer. The guilt or innocence of the defendant specifically depends on the validity of the officer's act. Therefore, if a policeman erroneously, capriciously, or arbitrarily orders peaceful demonstrators to disperse, acts of resistance or obstruction by the demonstrators would not subject them to criminal liability under this provision.

Second, the basis of plaintiffs' argument is not the scope of the enactment, but its possible misapplication. The constitutionality of a statute, however, is not dependent on its susceptibility of misapplication. For every statute

is susceptible of abuse, misuse of misapplication. Rather, its validity depends on whether the language of the statute, given its normal meaning, is so broad that it intrudes upon Constitutional rights.[86] If the language is so broad that its sanctions may be applied indiscriminately to constitutionally protected conduct, as well as to conduct which may properly be proscribed, it violates substantive due process and, therefore, is unconstitutional.

The instant statute, however, does not contain such overreaching language. While admittedly, like any statute, it may be misapplied, its sanctions apply only to knowing physical resistance or obstruction of a valid act of a peace officer. These sanctions, therefore, do not ultimately depend on the subjective views of those charged with its enforcement. Consequently, we conclude that it is neither vague nor overbroad.

### The Intimidation Statute

Plaintiffs further attack the Illinois Intimidation Statute, Ill.Rev.Stat. ch. 38, § 12–6. Although none of the plaintiffs currently face prosecution under this provision, they contend that it has a chilling effect on their exercise of First Amendment freedoms of speech, assembly, and petition, by reason of its vagueness and overbreadth. They fear that it will be used to punish them for threatening to engage in "direct action and protest activities" if political, economic, and social institutions do not meet their demands for an end to racial discrimination.

The statute provides:

(a) A person commits intimidation when, with intent to cause another to

---

84. Cf. Ill.Rev.Stat.Ann. ch. 38, § 31–1 (Smith-Hurd 1964) (Committee Comments). An analogous United States statute describing "Assault on a Process Server," 18 U.S.C. §, 1501, has been similarly construed to prohibit only resistance or obstruction of a law officer while in the performance of a legally effective act. See, e. g., Sparks v. United States, 90 F.2d 61 (6th Cir. 1937); Briggs v. United States, 24 F.2d 961 (9th Cir. 1924).

85. There is an exception to this rule in another section of the Illinois Criminal Code. If the act which is resisted or obstructed is the making of an arrest, a private person is not authorized to resist such arrest with force even though he knows the arrest is unlawful. See Ill. Rev.Stat. ch. 38, § 7–7 (1967). See, also, Ill.Rev.Stat.Ann. ch. 38, § 31–1 (Smith-Hurd 1964) (Committee Comments).

86. See authorities cited notes 41–43, supra and accompanying text.

perform or to omit the performance of any act, he communicates to another a threat to perform without lawful authority any of the following acts:

(1) Inflict physical harm on the person threatened or any other person or on property; or

(2) Subject any person to physical confinement or restraint; or

(3) Commit any criminal offense; or

(4) Accuse any person of an offense; or

(5) Expose any person to hatred, contempt or ridicule; or

(6) Take action as a public official against anyone or anything, or withhold official action, or cause such action or withholding; or

(7) Bring about or continue a strike, boycott or other collective action.

(b) Penalty. * * *

The statute is a section of the Illinois Criminal Code of 1961. According to a revisor's note, it replaces eighteen sections of the prior criminal code which proscribed an array of activities by private persons and public officials.[87] The Illinois Supreme and Appellate Courts have not had occasion to construe the statute, and in the posture of this case, we are without benefit of a lower state court's construction. Under these circumstances, we must again place our own construction upon it, giving words their reasonable and natural meaning.

This statute is an omnibus provision designed to prohibit all manner of threats and unlawful communications intended to compel a person to act against his will.[88]

The State of Illinois unquestionably has a legitimate interest in protecting persons from coercion by threats, even though expression is involved. "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." [89] However, at the outset of this analysis it should be recognized that Illinois has no legitimate interest in proscribing as intimidation statements that have no reasonable tendency to coerce or statements which, although alarming, are not expressions of an intent to act.

Legitimate political expression intended to secure changes in a society's legal, political, social, or economic structure frequently takes the form of expressions about future events or conditions. Such expression may be in the form of promises, predictions or warnings, or threats of lawful action.

 While we doubt that threats of the character proscribed by the Illinois Intimidation statute are legitimate forms of expression, the point at which legitimate expression becomes coercive expression of unlawful intent is not easily determined, especially in the heat of public debate. The freedoms of expression, however, are extremely vulnerable to excessive restriction. "The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. * * * Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow

---

87. See Ill.Rev.Stat. ch. 38, §§ 240–246, 376–383, 456–464 (1960 repealed).

88. It is supplemental to other sections of the Criminal Code of 1961, which proscribe theft by means of threat, Ill.Rev. Stat. ch. 38, §§ 16–1, 16–3 (1967), deceptive practices, Ill.Rev.Stat. ch. 38, § 17–1 (1967), and official misconduct, Ill. Rev.Stat. ch. 38, § 33–3 (1967). The latter, more specific statutes cover the common law crimes of extortion and blackmail.

89. Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949). See, also, Cox v. State of Louisiana, 379 U.S. 559, 563, 85 S.Ct. 476, 13 L.Ed.2d 487 (1963); Fox v. State of Washington, 236 U.S. 273, 277, 35 S.Ct. 383, 59 L.Ed. 573 (1915); Chaplinsky v. State of New Hampshire, 315 U.S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

specificity." [90] The necessity for such "breathing space" requires that only threats of substantial evil be proscribed.[91]

The elements of the offense of intimidation are set forth in paragraph (a). Seven sub-paragraphs specify various acts which may not be threatened if the elements of paragraph (a) are met.

There are three elements of the offense of intimidation defined in paragraph (a) of § 12–6. First, there must be a threat to perform without lawful authority one of the acts specified in the statute. Second, there must be a communication of the threat to another, not necessarily the person threatened. Third, there must be an accompanying intent to cause another to perform or omit the performance of an act.

The term "threat" has a sinister and well-defined meaning in common parlance and in the law. It is "the expression of an intention to inflict evil or injury on another." [92] It is more than a mere expression of such an intent; it is "a menace; especially, any menace of such a nature and extent as to unsettle the mind of the person on whom it operates, and to take away from his acts that free and voluntary action which alone constitutes consent." [93] It is not the abstract meaning of words that constitute an expression a threat, but their reasonable tendency under the circumstances to place another in fear that the threat-maker will perform the threatened act. An innocent expression may be threatening because of the ominous circumstances in which it is made.

Similarly, a statement that is literally a declaration of intent to do harm to another is not a threat if the context negatives any reasonable apprehension that the speaker intends what he says he intends.

Implicit in the word "threat", as it is used in a criminal statute, is this requirement: that the expression in its context have a reasonable tendency to create apprehension that its originator will act according to its tenor.

We find this implicit in the Illinois Intimidation Statute. The Illinois Appellate Court placed such a construction on the word "threat" in an extortion statute which § 12–6 replaced.[94]

The statute does not prohibit every threat communicated with the required intent, but only those to perform "without lawful authority" any of seven specified acts. "Authority" is defined as "legal or rightful power; a right to command or to act; power exercised by a person in virtue of his office or trust; dominion; jurisdiction; authorization." [95] In the broad sense of this definition lawful authority is the legal right or power to act. In the narrow sense it is the official power or jurisdiction to act.

The private citizen has lawful authority in the broad sense to perform most of those acts specified in the Illinois Intimidation Statute under certain circumstances. He is sometimes justified in using force against another,[96] or in physically restraining another.[97] He has the power to initiate criminal prosecution against another and the right to

90. N.A.A.C.P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). See, also, New York Times Co. v. Sullivan, 376 U.S. 254, 271–272, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Cantwell v. State of Connecticut, 310 U.S. 296, 311, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

91. See, e. g., Dennis v. United States, 341 U.S. 494, 507–510, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); Martin v. City of Struthers, 319 U.S. 141, 143–144, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); Schneider v. State of New Jersey, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

92. Webster, New International Dictionary, n. 1a (3d ed. 1964 Unabridged).

93. Black, Law Dictionary (4th ed. 1951).

94. See Moore v. People, 69 Ill.App. 398, 401 (1896).

95. Webster, New International Dictionary n. 1 (3d ed. 1964 Unabridged).

96. See Ill.Rev.Stat. ch. 38, Art. 7 (1967).

97. See Ill.Rev.Stat. ch. 38, §§ 7–6, 7–9, 10–3 (1967).

give information and testimony against another. He may make statements injurious to another's reputation, provided he does not commit defamation. He may engage in collective action in all save a few forms.

If "lawful authority" is confined to the narrow meaning of official power conferred by law, the private citizen, by definition a person without official power, has no "authority" to perform any of the acts specified in the intimidation statute. Placing such a meaning on the phrase "lawful authority" in the statute would result in an unreasonable and unnatural construction. Such a construction would make criminal the threat to do lawful acts, including acts expressly permitted by the Criminal Code, in the most legitimate circumstances. It would, for example, make criminal a threat to use justified force in defense of person or property and a threat to file legitimate criminal charges.

Given a reasonable and natural construction, the statute prohibits only threats to do any of the specified acts if the doing of that act would be unlawful considering the circumstances existing when the threat is made and giving effect to the qualifications contained in the threat. The phrase "without lawful authority" is not limited to criminal illegality; an act without lawful authority may be either a crime or a tort, or both. The statute therefore refers to some of the provisions of Illinois criminal and civil law. In this respect the offense of intimidation resembles the inchoate offenses of solicitation, conspiracy, and attempt, which refer to other provisions of the criminal law.[98]

Since the statute incorporates some of the provisions of criminal and civil law, all the defenses that would have been available to the accused if he had carried out his threat and had been prosecuted or sued for doing so are available to him in a prosecution for intimidation.[99] This is implicit in the statute and consistent with that section of the Illinois Criminal Code which provides: "It is a defense to a charge of solicitation or conspiracy that if the criminal object were achieved the accused would not be guilty of an offense." Ill.Rev. Stat. ch. 38, § 8–3 (1967).

The remainder of paragraph (a) requires little interpretation. The required state of mind is an intent to cause another to act or refrain from acting by inducing fear that the threat will be carried out of he does not act or refrain. The required communication may be by any means.

Sub-paragraph (a) (1) prohibits threats to "inflict physical harm on the person threatened or any other person or, on property [without lawful authority]". The infliction of physical harm on another or on property is always unlawful, unless it is justified in defense of person or property or in protection of public health, safety, welfare or morals. The situations in which force may be used against another are defined in the Criminal Code.[100] It is readily apparent, therefore, that a threat to inflict physical harm on another or on property, when communicated with intent to coerce, would violate the intimidation statute unless the use of the force threatened would be justified. Similarly, it cannot be said that threats of physical harm to person or property are an insubstantial evil. Indeed, principles of individual liberty require that persons be protected from the apprehension engendered by such threats. This provision, therefore, is neither vague nor overbroad.

Sub-paragraph (a) (2) makes criminal threats to "subject any person to physical confinement or restraint [without

---

98. See Ill.Rev.Stat. ch. 38, art. 8 (1967).

99. There is an obvious exception. He could not defend on the ground that performance of the threatened act was impossible because of some fact unknown to

the person threatened. Cf. Ill.Rev.Stat. ch. 38, § 8–4(b) (1967).

100. See Ill.Rev.Stat. ch. 38, §§ 7–6, 7–9, 10–1, 10–2, 10–3 (1967).

lawful authority]." The limits of lawful authority to confine and restrain another are found in the law governing criminal procedure, the law of guardian and ward, domestic relations law, and certain health laws. The private citizen is seldom justified in restraining another.[101] It is thus apparent that unless such justification exists, or would exist if the qualifications in the threat were given effect, a threat to restrain or confine another is intimidation. This proscription is obvious to men of common intelligence.

■ Likewise, it is not overreaching. Threats of false imprisonment or unlawful restraint pose a substantial evil which the state has a legitimate interest in preventing. Given its reasonable and natural construction, the phrase "without lawful authority" excepts threats to restrain in situations where the law recognizes justifiable restraint. This provision's scope, therefore, is narrow and precise.

Sub-paragraph (a) (3) prohibits threats to "commit any criminal offense." The qualifying phrase, "without lawful authority," is redundant as applied to this sub-paragraph, since a criminal offense, by definition cannot be committed with lawful authority. The word "offense" is defined in the Illinois Criminal Code as meaning "a violation of any penal statute of this State."[102] Consequently, the sub-paragraph makes criminal threats to violate any Illinois statute imposing a penalty. The addition of the adjective "criminal" does not narrow the meaning of this provision.

The provision is not vague. It is, however, overbroad since it prohibits threats of insubstantial evil. The commission of criminal offenses against persons or property is a substantial evil, and the state may legitimately proscribe the making of threats to commit such offenses. The commission of offenses against public order *only*, however, is not such a substantial evil that the state may prohibit the threat of it. Sub-paragraph (a) (3) proscribes threats to violate *any* penal statute. It therefore makes criminal threats such as the following: (1) threats by dissentient groups to engage in disorderly conduct,[103] threats by residents of a high-crime neighborhood to carry concealed weapons for their own protection,[104] and threats by mothers to block a dangerous state highway to demonstrate the need for increased safety measures.[105] Indeed, the phrase "commit any criminal offense" is so broad as to include threats to commit misdemeanors punishable by fine only. These evils are not so substantial that the state's interest in prohibiting the threat of them outweighs the public interest in giving legitimate political discussion a wide berth.

■ Since the language of sub-paragraph (a) (3) is an overbroad restriction on freedom of speech, it is invalid. Obviously, however, if the threat is carried out, the persons who violate the criminal law by their acts are subject to punishment. Therefore, we hold only that making it an offense to threaten to commit any crime, no matter how minor or insubstantial, is an unwarranted limitation.

Sub-paragraph (a) (4) prohibits threats to "accuse any person of an offense [without lawful authority]." "Accuse * * * of an offense" has both a technical and a non-technical meaning. In its technical sense it means "to bring a formal charge * * * before a court or magistrate having jurisdiction to inquire into the alleged crime."[106] In its non-technical sense it means to make allegations that another has committed an offense. Such an allegation made only in the presence of the person ac-

101. See Ill.Rev.Stat. ch. 38, §§ 7–6, 7–9, 10–1, 10–2, 10–3 (1967).

102. See Ill.Rev.Stat. ch. 38, § 2–12 (1967).

103. See Ill.Rev.Stat. ch. 38, § 26–1 (1967).

104. See Ill.Rev.Stat. ch. 38, § 24–1(a) (4) (1967).

105. See Ill.Rev.Stat. ch. 95½, § 197 (1958).

106. Black, Law Dictionary (4th ed. 1951).

cused would not be coercive, and a threat to unlawfully publish such an allegation would fall within sub-paragraph (a) (5). For these reasons, we believe the phrase should be given its technical meaning in sub-paragraph (a) (4).

The filing of a criminal charge against another is "without lawful authority" only if the person accused is innocent of the charge and the accuser acts with malice and without probable cause to suspect that the accused committed the crime.[107] The threat to accuse another of an offense violates the intimidation statute only if the person threatened is innocent and the threat-maker, at the time he communicates the threat, had no reasonable grounds for his suspicions. Malice can be inferred from the threat-maker's intent to coerce another by inducing a fear of prosecution.

 This provision is neither vague nor overbroad. It clearly proscribes only threats of false, malicious, and unfounded prosecution. Such threats are well outside the ambit of protected speech.

 Sub-paragraph (a) (5) makes criminal threats to "expose any person to hatred, contempt or ridicule [without lawful authority]." This phrase is taken from the definition of libel and slander.[108] The exposure of another to hatred, contempt or ridicule is unlawful when it constitutes libel, slander, invasion of privacy, or criminal libel. In a prosecution for violation of this sub-paragraph the state would be required to prove, in addition to the other elements of the intimidation statute, that the threat-maker's execution of his threat would have constituted one of those torts or crimes *given his state of mind and the circumstances existing at the time the threat was made.* For ex-

ample, if the person whose exposure was threatened were a public official and the threatened statements related to his official conduct, the state would be required to prove that the threat-maker knew the statements were false or did not know whether they were true or false.[109] This sub-paragraph is neither vague nor overbroad. It proscribes threats to defame and certain threats to invade privacy. Considering federal constitutional limitations on the law of libel and slander, particularly where public officials are concerned, such threats are not protected. Nor is their protection essential to the protection of legitimate political expression.

Sub-paragraph (a) (6) prohibits two forms of threats. First, it prohibits threats to "take action as a public official against anyone or anything, or withhold official action [without lawful authority]." The Illinois Criminal Code defines "public officer" as "a person who is elected to office pursuant to statute, or who is appointed to an office which is established, and the qualifications and duties of which are prescribed by statute, to discharge a public duty for the State or any of its political subdivision,"[110] and defines "public employee" as "a person, other than a public officer, who is authorized to perform any official function on behalf of, and is paid by, the State or any of its political subdivisions."[111] In using the term "public official" in the intimidation statute, the legislature apparently intended to reach both public officers and public employees. This construction of the term "public official" is consistent with the definition of "official" in the Criminal Code's article prohibiting civil rights violations.[112] Consistent with these definitions, the term "official action" must

---

107. See Cowper v. Vannier, 20 Ill.App.2d 499, 500–501, 156 N.E.2d 761 (1959).

108. See New York Times v. Sullivan, 376 U.S. 254, 279–280, 84 S.Ct. 710, 11 L. Ed.2d 686 (1964).

109. See New York Times v. Sullivan, 376 U.S. 254, 279–280, 84 S.Ct. 710, 11 L.Ed. 2d 686 (1964).

110. Ill.Rev.Stat. ch. 38, § 2–18 (1967).

111. Ill.Rev.Stat. ch. 38, § 2–17 (1967).

112. See Ill.Rev.Stat. ch. 38, § 13–1(c) (1967).

be construed to mean any governmental action, ministerial as well as discretionary. The sub-paragraph therefore prohibits any threat made by a public officer or employee to take or withhold governmental action.

Second, the sub-paragraph prohibits threats to "cause [without lawful authority] such action or withholding." "[S]uch action or withholding" refers to a public officer's or public employee's taking or withholding of governmental action. The verb "cause" when used to define the intent element of the offense of intimidation has a definite meaning. Its context there gives it an active, positive connotation. Similarly, when used in sub-paragraph (a) (6) to define one of the acts which may not be threatened, its meaning is certain. It has an active, positive connotation to effect, to compel, to take action, to bring about.

The state has a legitimate and substantial interest in precluding public officials or persons purportedly influential with public officials from threatening official action or the withholding thereof for the purpose of inducing the person threatened to take some action desired by the public official or one purporting to have influence with a public official. Nor, as we have indicated, are threats generally within First Amendment protection.

■ In our reading of this sub-paragraph, we do not interpret it to include threats by one public official or employee to another, but rather only threats by public officials or persons associated with them to individuals outside the area of government who are unable to protect themselves from abuse of official authority or power and may therefore be coerced or intimidated by such threats.

■ In the light of all of the foregoing, we conclude that sub-paragraph (a) (6) is valid.

Sub-paragraph (a) (7) makes criminal threats to "bring about or continue a strike, boycott or other collective action [without lawful authority]." While the terms "bring about" and "collective action" are not crystal clear, they are not so vague and indefinite that persons of normal intelligence will have difficulty in understanding their meaning. The remaining language of the sub-paragraph is quite clear. It prohibits threats to unlawfully continue strikes or boycotts. It is unlawful to continue a strike or boycott only if the strike or boycott is unlawful. They are unlawful in certain circumstances by virtue of the National Labor Relations Act,[113] state labor statutes, and state and federal trade regulation laws. They also may be unlawful because of the means by which they are pursued.

■ Prohibiting the use of threats to cause or continue unlawful strikes, boycotts or similar action in order to coerce or intimidate persons to perform or omit the performance of acts which the person threatening desires to have performed or omitted is within the police power of the state. Nor is such a threat within First Amendment protection.

We recognize that the conclusion of validity may inhibit the making of threats which some persons may deem desirable, e. g., the threat of a teachers' strike which would be an unlawful strike under Illinois law. We do not determine that the sub-paragraph in question would even be applicable to such a threat. Nor do we seek to determine its constitutionality under any and all circumstances. We hold simply that given a legitimate state interest, statutory language understandable by persons of common intelligence and no impingement on protected activity, the provision is valid. Its possible unconstitutional application in a given factual situation we leave to that case when and if it ever arises.

*Amici curiae* have argued that the statute generally is impermissibly vague because it refers to other provisions of

113. 29 U.S.C.A. § 151 et seq.

criminal and civil law that may be vague. The reference to other provisions of criminal and civil law is not for the purpose of explaining vague language in the instant statute,[114] but for the purpose of defining the acts which may not be threatened. The argument advanced by *amici curiae* would deny the state the power to prohibit intimidation and the inchoate offenses except by a compendious statute. This is neither practical nor constitutionally required.

We recognize that the intimidation statute does not furnish a definite standard to the extent that the provisions of criminal and civil law referred to may be vague. The constitutional infirmity resides in those provisions, however, not in the intimidation statute, and the proper remedy is clarification or invalidation of them.

## CONCLUSION

In conclusion, a few general observations which are relevant to our opinion and decision here should be made explicit although they are implicit therein.

▮ First, a presumption of validity attaches to legislative enactments.[115]

▮ Second, if the normal and natural construction of statutory language or even a narrow interpretation thereof will preserve the constitutionality of a statute, it must be sustained.[116]

▮ Third, only of the statutory language is so vague and indefinite that men of common intelligence will not be able to understand it and regulate their conduct accordingly, or if in its normal and natural meaning it is overbroad and proscribes conduct constitutionally protected, may it be held unconstitutional and void.[117]

▮ Fourth, the fact that a statute may be misapplied, misused or abused does not render the statute invalid; self-enforcing or foolproof laws have not yet been invented.

Fifth, the interpretation of a state statute by a lower federal court is not necessarily binding on the state courts, though the two sections of the Illinois Criminal Code which we have found to be invalid appear to us to be clearly unconstitutional.

Finally, we would make two related observations. The declaration of validity and constitutionality here made with respect to the various statutes is predicated on the construction and interpretation of each set forth herein. To the extent that the state courts may make other and broader interpretations or constructions, the holdings here would necessarily be subject to reexamination.

Conversely, we recognize that while we have held these statutes to be valid as we construe and interpret them, their application in specific instances may give rise to further constitutional questions. No declaratory judgment as to the constitutionality of a statute can anticipate and determine all future cases which may arise thereunder. We have endeavored to delineate guidelines of construction and interpretation which balance the legitimate interest and duty of the state to preserve the peace, and the constitutionally protected rights of free speech, peaceful assembly and peaceful demonstration guaranteed by the First Amendment to every citizen. Inevitably, in practical application, further questions will arise.

Judgment will be entered in accordance with the declarations and conclusions reached herein.

114. Cf. Keyishian v. Board of Regents, 385 U.S. 589, 604, 87 S.Ct. 675, 17 L.Ed. 2d 629 (1967).

115. See, e. g., Goldblatt v. Town of Hempstead, 369 U.S. 590, 595–596, 82 S.Ct. 987, 8 L.Ed.2d 130 (1961); Flemming v. Nestor, 363 U.S. 603, 611, 81 S. Ct. 29, 4 L.Ed.2d 1435 (1960); Sobel v. Adams, 208 F.Supp. 316, 324 (S.D.Fla. 1962).

116. See, e. g., Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); Cox v. State of New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); Cf. United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

117. See authorities cited notes 38–43 supra and accompanying text.